514 So.2d 332 (1987)
Clinton Dean WILLIAMS
v.
DIXIE ELECTRIC POWER ASSOCIATION.
No. 56852.
Supreme Court of Mississippi.
September 16, 1987.
Rehearing Denied November 18, 1987.
*333 Stanford Young, David Slaughter, Waynesboro, Alfred Lee Felder, McComb, for appellant.
J.W. Land, Michael K. Randolph, Victor K. Smith, Bryan, Nelson, Allen, Schroeder & Randolph, Hattiesburg, for appellee.
Before the Court en banc.
HAWKINS, Presiding Justice, for the Court:
This is an appeal of jury's verdict for Dixie Electric Power Association (Dixie Electric) in a personal injury suit brought by Clinton Dean Williams. Williams, a lineman, was injured when a telephone pole he was climbing broke. Because the Dixie Electric was allowed to introduce evidence which they had not provided to Williams in his discovery request, we reverse and remand for new trial.

FACTS
Dean Williams served as a journeyman lineman employed by Tom C. Loftin Contractors, Inc. (Loftin Contractors). He had several years experience as a lineman.
Dixie Electric, a power co-operative within the Rural Electrification Association (REA), used Loftin Contractors as an independent contractor to service their powerlines.
On September 17, 1979, Williams was working near Sanderville in Jones County to repair electric service to the Dixie power *334 system following damage by Hurricane Fredrick. Several poles and trees were down in the area where Williams worked. Before he climbed a pole to make repairs, a supervisor, Nathan Riley, told Williams to check the pole to make sure it was sound. Williams struck the butt of the pole on which he was injured with a hammer and thought it was solid. But after climbing the pole, when Williams was some distance above the ground, the pole broke approximately six-to-eight inches below the ground. Williams fell and suffered severe back injuries for which he received $19,800 in medical treatment.
Williams sued Dixie Electric asserting they failed to properly inspect and maintain the pole. The pole in question was manufactured in 1941 and Williams presented evidence at trial to show it was weakened due to soft rot.
Just before trial the defense hired Ray Schmidt to follow Williams and record his activities covertly. On Thursday, November 15, 1984, four days before trial, Schmidt filmed Williams walking without difficulty after he left a deposition in Meridian. Dixie Electric's attorneys did not disclose the existence of this film to Williams' attorneys prior to trial.
In his opening statement, Williams' attorney told the jury that Williams was too injured to sit through the entire trial. After the defense attorney heard this, he directed Schmidt to continue filming Williams.
Williams offered Dr. Jeffrey F. Webster, a clinical psychologist, as his first witness. Dr. Webster testified that he interviewed Williams for three hours, and conducted four hours of testing to assess Williams' intelligence. Dr. Webster said Williams suffered from a "closed head injury" which he defined as an injury in which the skull is not cracked. Dr. Webster testified that as a result of his fall, Williams suffered brain damage and could only function just beyond the second grade level. Dr. Webster also testified Williams had coordination problems and suffered from mild depression. During cross-examination Dr. Webster said he relied in part on test results of a Wide Range Achievement Test (WRAT) given by Dr. Randall Thomas to help form his opinion. After hearing this the defense counsel asked the court to exclude Dr. Webster's testimony. The trial judge heard the argument of counsel and excluded Dr. Webster's testimony citing City of Laurel v. Upton, 253 Miss. 380, 175 So.2d 621 (1965), as authority.
Next Williams presented the deposition of Dr. Jeffrey Ellison, a neurologist from the Oschner Clinic in New Orleans, Louisiana. Dr. Ellison noted that Williams had damage to the nerve root of the right posterior tibial nerve which caused Williams to drag his foot. He said a CAT scan revealed that Williams' L-2 vertebra had a moderate compression deformity caused by the fall. Dr. Ellison concluded that Williams could not work in a job requiring walking or climbing, but he could perform sedentary work.
Next Williams took the stand. He told the jury he could not remember anything about his accident. He said he wore a corset sometimes and his feet would go to sleep after sitting 35 to 40 minutes. Williams' attorney tried to demonstrate that Williams had little intellect by eliciting testimony that he could not remember his children's ages and showing that he had difficulty counting backwards from twenty.
The defense tried to show Williams' brain damage, if any, was the result of a severe shock from 7,500 volts Williams received six months prior to the accident. They introduced a medical record in which the physician treating the shock noted Williams had "severe difficulty with speech and some problems with motor function musculature."
After Williams testified, Sarah Williams, Dean Williams' wife, took the stand. She said Williams suffered from muscle spasms, often carried a cane to walk with, and that he could no longer drive a car.
Then Dr. Randall Thomas, a psychologist, took the stand. He said tests which he gave Williams indicated that Williams had problems thinking, remembering and concentrating. Dr. Thomas said Williams read on a third grade level, but basically *335 functioned on a second grade level. He added that Williams had an I.Q. of 69 and because of his problems, he was incapable of returning to gainful employment.
Before Williams rested, his attorney tried to recall Dr. Jeffrey Webster as a witness. The trial judge warned plaintiff's counsel it would be improper to offer the same testimony twice and the refused to overrule his earlier ruling excluding Dr. Webster's testimony.
At 9:00 on Wednesday, the third day of trial, defense counsel for the first time informed the court and the plaintiff of the existence of the surveillance films and served William's attorney with written notice of them. By the end of the day, the plaintiff rested, the jury was dismissed, and the attorneys and judge viewed the video tapes.
Schmidt had taken three films of Williams. The first was taken on Thursday, four days before trial. Since Williams did not attend most of the trial, Schmidt had checked into the hotel room adjacent to Williams and made tapes of his activities on Monday and Tuesday during trial. The films show Williams strolling without his cane and bending over with ease to inspect an acorn he spied on the ground. One film depicts Williams placidly sitting in his pickup truck for over twenty minutes. No doubt he was content with the knowledge that his damage suit lawyers  who may be equaled but never surpassed  were zealously pleading his cause.
The films were introduced on Friday, November 23, 1984, over the plaintiff's objection.
That day the jury returned a verdict for Dixie Electric and the circuit judge overruled Williams' motion for a new trial.

LAW
Williams does not argue substantive issue of negligence and causation. Specifically, Williams argues:
I. THE COURT ERRED IN ALLOWING DIXIE ELECTRIC TO USE VIDEO PICTURES WHOSE EXISTENCE WAS NOT DISCLOSED BY PROPER SUPPLEMENTATION OF DISCOVERY REQUEST.
II. THE TRIAL COURT ERRED AND WAS MANIFESTLY WRONG IN EXCLUDING THE TESTIMONY OF DR. JEFFREY WEBSTER, NEUROPSYCHOLOGIST.
III. THE TRIAL COURT ERRED AND WAS MANIFESTLY WRONG IN FAILING TO EXCUSE THOSE MEMBERS OF THE JURY PANEL WHO WERE MEMBERS OF THE DIXIE ELECTRIC POWER ASSOCIATION.

I.

DID THE TRIAL COURT ERR IN ALLOWING THE DEFENDANT TO INTRODUCE THE SURVEILLANCE FILMS OF WILLIAMS WHICH WERE TAKEN JUST PRIOR TO AND DURING TRIAL?
In the plaintiff's request for production, he asked Dixie Electric to:
Produce any and all photographs (still or moving) made by the defendant, or anyone representing defendant, of the scene of the injury, the pole which was involved in said injury, or any other photographs relating to the subject matter relating to this litigation or of the plaintiff.
Williams complains that the trial judge should not have admitted the video tapes because Dixie Electric failed to disclose their existence prior to trial.
This Court has developed strict discovery rules in order to avoid trial by ambush and to insure each party has a reasonable time to prepare for trial. We are committed to the discovery rules because they promote fair trials. Once an opponent requests discoverable material, an attorney has a duty to comply with the request regardless of the advantage a surprise may bring. Harris v. General Host Corp., 503 So.2d 795, 797 (Miss. 1986); Tolbert v. State, 441 So.2d 1374, 1375 (Miss. 1983). As is evident in this case, attorneys are reluctant to abide by discovery rules when they can profit by catching their opponents unaware.
Dixie Electric tried to argue the surveillance films were offered to rebut the plaintiff's *336 case and that rebuttal evidence is not discoverable. In Harris we rejected a similar contention because only some of an undisclosed witnesses' testimony rebutted the plaintiff's evidence. We added, if we accepted such a theory, "there would be no basis for the principle for ever requiring the defendant to disclose in advance the evidence it would offer at trial, for all such evidence in this sense is rebuttal." Harris, supra, at 797.
Dixie Electric relied heavily on the surveillance films to question the extent of Williams' injury and to test his credibility. In Kern v. Gulf Coast Nursing Home of Moss Point, 502 So.2d 1198 (Miss. 1987), the Court allowed an undisclosed witness to testify where the defense attorney demonstrated he had no way of knowing of the existence of the witness before trial and because the witness's testimony was strictly limited to rebuttal. Id. at 1200, 1201. The crucial difference between Kern and this case is that Dixie Electric had the surveillance films four days prior to trial and they knew they would use them at trial.
Tolbert v. State, supra, is similar to the case at bar. Tolbert, a defendant in a murder case, threatened the principal witness against him in order to get her to change her testimony. The police "wired" the witness and reported three conversations between her and Tolbert with the final conversation occurring on the eve of trial. The defendant was unaware of these recordings until the State presented them at trial. On appeal the State argued that the tapes were offered in rebuttal and were not subject to court ordered discovery. We rejected that argument:
There is no distinction in an incriminating statement being offered by the State's case in chief, or reserving it for rebuttal, the accused is nevertheless entitled to discovery so as not to be caught by surprise at trial ... the State was justified in refraining from informing the defendant of its recordings while the investigation and criminal activities of Tolbert were in progress. We must hold, however, that after a court has entered a discovery order, it must be complied with in some meaningful way. In this case, this would mean that at some point before trial began, Tolbert and his counsel should have been given an opportunity to listen to his recorded conversation, and make a transcription.
Id. at 1375, 1376.
Surveillance films may be used to test an opponent's case. Trapp v. Cayson, 471 So.2d 375, 380-381 (Miss. 1985); Jesco, Inc. v. Shannon, 451 So.2d 694, 702 (Miss. 1984); Burnham v. Nowell, 243 Miss. 441, 138 So.2d 493 (1962). As we said in Tolbert, the State, like the defendant herein, is justified in refraining from informing defendant of its recordings while the surveillance was in progress, but it must still comply with discovery in some meaningful way.
The values of surprise could be largely preserved by providing discovery or pre-trial revelation of impeachment material which falls within the present category only at a time shortly before trial, and only after the party asked about the existence and nature of such material had been given an opportunity  ordinarily by deposition  to commit the inquiring party to a final version of the events and claims related to the impeachment material. This procedure should forestall most conforming testimony, and would afford a reasonably effective means of embarrassing those who might still attempt to meet the impeaching material in untruthful ways. At the same time, it would be possible to prepare to meet impeaching material which is susceptible of honest explanation or refutation. Having preserved the values of surprise, there would be no remaining reasons to deny discovery * * *
Cooper, Work Product of the Rulesmakers, 53 Minn.L.Rev. 1269, 1318 (1969), quoted in C. Wright & A. Miller, Federal Practice and Procedure, § 2015 (1970).
Once Dixie Electric examined the films on Thursday evening, it had a duty to seasonably tender them to Williams' attorneys. Neither classifying the films as rebuttal nor continuing the surveillance after trial began changed Dixie Electric's duty to *337 comply with discovery. They had a duty to seasonably produce Thursday's surveillance film. In this case, since Dixie Electric obtained the film so close to trial, it should have given Williams' attorneys notice of them and an opportunity to view them prior to trial. Since Dixie Electric failed to comply with discovery rules in a meaningful way, the trial judge should not have admitted the films into evidence. Rule 37(b)(2)(B) and (a) MRCP.[1]

II.

DID THE TRIAL JUDGE ERR IN EXCLUDING THE TESTIMONY OF DR. JEFFREY S. WEBSTER BECAUSE HE RELIED IN PART ON THE TEST GIVEN BY ANOTHER PSYCHOLOGIST?
During cross-examination Dr. Webster testified that he used the test results of the Wide Range Achievement Test given by Dr. Randall Thomas. Dr. Webster testified that he based his testimony in part on Dr. Thomas' test results, but he formed his own opinion based on his own tests and observations. The trial judge excluded Dr. Webster's testimony.
Beginning with Wild v. Bass, 252 Miss. 615, 173 So.2d 647 (1965), this Court held that a medical expert must base his opinion from facts within his personal knowledge, on the testimony of other witnesses, or other evidence introduced at trial. Id. at 628, 173 So.2d 647. In Wild we found the trial judge erroneously admitted an expert's opinion, part of which was based on the reports and opinions of others. Id.
In City of Laurel v. Upton, supra, on cross-examination the appellee's expert revealed that in arriving at his opinion he considered the reports, letters and the opinion of another doctor. The defendant tried to introduce the reports and letters into evidence, but the trial judge refused and excluded them. This Court recognized the rule established by Wild v. Bass, and held the trial court erred in refusing to permit introduction of these documents and cross-examination there as to.
In Entex, Inc. v. Rasberry, 355 So.2d 1102 (Miss. 1978), the plaintiff's principal witness based his opinion exclusively on two x-rays which he had never seen and which were not introduced into evidence. Again we cited Wild v. Bass and concluded that the trial judge properly excluded expert testimony which was based solely on facts gathered and conclusions made by other sources. Id. at 1103. See also: Hickox v. Holleman, 502 So.2d 626 (Miss. 1987).
Of course, an expert can rely on results of tests conducted by a third party if the results are placed in evidence. Belesky v. City of Biloxi, 412 So.2d 230, 234 (Miss. 1981).
Doctors normally correspond with one another and a doctor's testimony will not be excluded merely because he looks at another doctor's opinion. The expert may testify so long as he bases his opinion on his own examination and conclusions, not solely on the opinion of another expert. Wood v. Walley, 352 So.2d 1083, 1086 (Miss. 1977); Dennis v. Prisock, 221 So.2d 706, 711 (Miss. 1969).
In the case at bar, Dr. Webster testified that he used on the test results of Dr. Thomas, but he based his opinion on his own observation and testing. Even though Dr. Thomas' test results were admitted into evidence, the trial judge excluded Dr. Webster's testimony. The circuit judge erred in not permitting Dr. Webster to testify because he did not base his testimony solely on the opinion of Dr. Thomas. Additionally, the test results were in evidence so Dixie Electric had the opportunity to fully cross-examine Dr. Webster as to the basis of his opinion.

III.

DID THE TRIAL JUDGE ERR IN FAILING TO EXCUSE THOSE MEMBERS OF THE JURY PANEL WHO WERE MEMBERS OF THE DIXIE POWER ELECTRIC ASSOCIATION?
We specifically addressed this issue in Garcia v. Coast Electric Power Ass'n., *338 493 So.2d 380, 383 (Miss. 1986). In Garcia the jury venire was asked and responded that they would be fair and impartial. On appeal Garcia argued "a member of a co-operative association, which is a party to a lawsuit, is per se disqualified from sitting as a juror." Id. We rejected that argument:
In a largely rural area such as exists in Mississippi, all people outside municipalities are supplied by electric co-operatives. Any pecuniary gain the customer or member receives is practically nil. Most of those co-operatives have been in existence since the early 1930s, and, in the presentation of this case and the briefs, there has been no citation of a case in the state, which also inclined toward the rule announced in Ozark, supra, and Thompson, supra [which held that members of electric corporation are disqualified from service as jurors from the trial of a case in which damages are sought against the corporation. Ozark Border Electric Co-Op v. Stacy, 348 S.W.2d 586 (Mo. App. 1961); Thompson v. Sawnee Electric Membership Corp., 157 Ga. App. 561, 278 S.E.2d 143 (1978)]. Mississippi jurisprudence is not ready to adopt or establish such a rule. We have adequate law and authority which will provide for the obtaining of a fair trial and an impartial jury without such a per se disqualification for cause. Miss. Code Ann. § 13-5-69 to -79 (1972 and Supp. 1985); Belesky v. City of Biloxi, 412 So.2d 230 (Miss. 1981); City of Jackson v. McFadden, 181 Miss. 1, 177 So. 755 (1937).
See also Bell v. City of Bay St. Louis, 467 So.2d 657 (Miss. 1985).
As in Garcia, Williams did not ask for a change of venue. His attorneys chose not to exercise Williams' right to challenge a juror for cause. The jury venire was asked and responded affirmatively that they could be fair and impartial even though they might be members of Dixie Electric. Following Garcia, which is directly on point, we overrule this assignment of error.
For the reasons stated herein, we reverse and remand for new trial.
REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.
WALKER, C.J., ROY NOBLE LEE, P.J., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.
NOTES
[1] On remand Dixie Electric may supplement its response to Williams' request for production in order to admit the films into evidence.