# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 93-KA-01197-SCT

*JUSTIN DAVID SHAFFER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/24/92 |
| TRIAL JUDGE: | HON. KATHY KING JACKSON |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ROBERT B. MCDUFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  DEIRDRE MCCRORY |
| DISTRICT ATTORNEY: | DALE HARKEY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 3/19/98 |
| MOTION FOR REHEARING FILED: | 4/2/98; Denied 09/02/99 |
| MANDATE ISSUED: 09/09/99 | |

**BEFORE PRATHER, C.J., PITTMAN, P.J., AND SMITH, J.**

**PITTMAN, PRESIDING JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. Justin Shaffer was indicted in July of 1991 for the March 14, 1991, capital murder (killing in the course of sexual battery) of Rachel Marshall. On November 24, 1992, a Jackson County jury found him not guilty of capital murder, but found him guilty of simple murder and sexual battery. The trial court sentenced him to life on the murder charge and thirty years on the sexual battery conviction to run consecutively. It is from this conviction and sentence that Mr. Shaffer files this appeal asserting the following as error:

> **I. WHETHER A REASONABLE JURY COULD HAVE CONCLUDED, BEYOND A REASONABLE DOUBT, THAT A CRIMINAL AGENCY WAS INVOLVED IN THE DEATH IN THIS CASE, AND THAT THE DEFENDANT WAS GUILTY OF CAUSING THE DEATH.**
>
> **II. WHETHER A REASONABLE JURY COULD HAVE CONCLUDED, BEYOND A REASONABLE DOUBT, THAT A SEXUAL BATTERY OCCURRED, AND THAT**

**THE DEFENDANT WAS INVOLVED IN IT.**

**III. WHETHER IT WAS ERROR FOR THE STATE TO AFFIRMATIVELY MISLEAD THE DEFENSE ABOUT THE RESULTS OF EXTREMELY IMPORTANT TESTING OF BLOOD AND BILE FROM THE DECEDENT'S BODY WHEN IN FACT NO TESTING HAD BEEN DONE AT ALL.**

**IV. WHETHER IT WAS ERROR FOR THE TRIAL COURT TO PROHIBIT THE DEFENSE FROM INTRODUCING IMPORTANT EVIDENCE ABOUT THE DECEDENT'S CONSUMPTION OF ALCOHOL AND DRUGS AND TO PREVENT THE DEFENSE FROM CROSS-EXAMINING THE STATE'S EXPERT ABOUT INFORMATION HE HAD RECEIVED IN THAT CONNECTION AND UPON WHICH HE HAD RELIED.**

**V. WHETHER IT WAS ERROR FOR THE TRIAL COURT TO INSTRUCT THE JURY ON DEPRAVED HEART MURDER WITHOUT REQUIRING THE JURY TO FIND THE STATUTORY ELEMENT OF A DEPRAVED HEART, ACTING REGARDLESS OF HUMAN LIFE.**

**VI. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTION TO PRESENT EVIDENCE OF PCR DNA TESTING WHEN IT HAS NOT REACHED GENERAL ACCEPTANCE IN THE SCIENTIFIC COMMUNITY.**

**VII. WHETHER IT WAS ERROR TO PERMIT THE PROSECUTION TO INTRODUCE TESTIMONY OF A DNA MATCH WHEN THERE WAS NO EVIDENCE TO EXPLAIN THE SIGNIFICANCE OF THE MATCH.**

**VIII. WHETHER IT WAS ERROR TO SUBMIT TO THE JURY THE COMBINATION CRIME OF "MURDER AND SEXUAL BATTERY" AS A SINGLE VERDICT OPTION, WITHOUT SUBMITTING THEM AS SEPARATE VERDICT OPTIONS, WHEN MISSISSIPPI LAW DOES NOT PROVIDE FOR SUCH A COMBINATION CRIME.**

¶2. The controlling issues in this case are (1) the failure to instruct the jury on the elements of the underlying crime of murder and (2)the failure to allow the defense to introduce evidence regarding decedent's consumption of alcohol and drugs and preventing the defense from cross-examining the state's expert about information he had received in that connection and upon which he had relied; these issues require reversal. However, the other issues raised by Shaffer are not without merit. The Court is troubled by issue III where the state misled the defense about the results of testing of blood and bile taken from decedent's body when in fact no testing had been done; and issue VIII where the trial court submitted to the jury the combination crime of "murder and sexual battery" as a single verdict option, without submitting them as separate verdict options. Although singly the foregoing issues considered by themselves might not be considered reversible error, taken together and in consideration with the entire record, this Court cannot find them to constitute harmless error. Further, this Court's findings on these issues should be followed on remand.

## STATEMENT OF THE FACTS

¶3. On the evening of March 13, 1991, Shaffer met an acquaintance, Thomas Hackman at O'Charley's, a Biloxi restaurant and bar. As Hackman testified at trial, he told Shaffer about a bar called the Julep Room in Ocean Springs, which was having Ladies' Night that night. The two then drove to the Julep Room in Shaffer's car, a white Buick Century. Shortly after they arrived at approximately ten o'clock that evening, Shaffer and Hackman were approached by Marshall who came up and introduced herself. Not long after she introduced herself to the men, Marshall told them she wanted to leave and go to her home. Marshall then visited people between tables for a little while and again came back to Shaffer and Hackman and stated that she wanted to leave and go home. Hackman testified that Marshall was "pretty intoxicated" and he offered to drive her car home. Shaffer followed in his car to Marshall's home in Ocean Springs.

¶4. Hackman testified that upon arriving at Marshall's home, he, Marshall, and Shaffer entered through the back door and went into the living room. As they were sitting down, Marshall asked if they "wanted to go have some breakfast." She also stated that "she wanted to get comfortable," took off her panty hose, and "said she was going to freshen up." At some point, Shaffer and Marshall "went in the kitchen" and "fixed a couple of drinks." Marshall put some music on the stereo, and both Shaffer and Hackman "slow danced with her a little bit." Hackman further testified that Marshall and Shaffer eventually danced into the stereo room adjoining the living room where they fell to the floor, kissed, and engaged in romantic activity for ten or fifteen minutes. Specifically, Hackman stated that Shaffer "was laying [sic] across Rachel. She was on her back on the floor. [Shaffer] was laying [sic] across her chest and they were kissing." On cross-examination, Hackman maintained that each time he looked in on them, "they were in the same position which put him across Mrs. Rachel, not on top of her." During the time that Shaffer and Marshall were in the stereo room, Hackman looked in on them "maybe five or six times or more." Thus, they were never out of his sight for more than two or three minutes. Hackman never saw either of them on top of the other; nor did he see either of them in a further state of an undress; nor did he see Shaffer's pants pulled down. Shaffer testified that he and Marshall had intercourse during this period of time and then came back into the living room.

¶5. Upon returning to the living room, Shaffer told Hackman that he "wanted to do the girl." Hackman replied that he thought "it was a good time to leave." Shaffer then asked whether Hackman would take his (Shaffer's) car back to Biloxi. Hackman said no and sat down on the couch. Marshall came in and sat down on the love seat and looked as though she were about to pass out. Shaffer picked her up and carried her into a bedroom and laid her down in the bed. Hackman testified that Shaffer had no sexual contact with Marshall at this time. Again, Hackman said that he and Shaffer should leave. As they prepared to do so, Hackman asked Marshall to follow them to the door so that she could lock it after they left. Shaffer and Hackman exited the back door, and Marshall "shut the door behind" them.

¶6. As Shaffer backed out of Marshall's driveway and entered the street in front of her house, he told Hackman that he wanted to go back to Marshall's house to retrieve his cigarettes. Hackman replied that cigarettes could be bought anywhere, and that they should simply go home. Shaffer then drove Hackman to the O'Charley's parking lot, where Hackman got out of Shaffer's car and into his own. At this time, approximately one o'clock in the morning, Hackman went home. He did not see Shaffer for the rest of the night.

¶7. On March 14, 1991, the Ocean Springs Police Department received a call that a woman had been

found dead in her bathtub at 1101 West Cherokee in Ocean Springs. The deceased was Marshall. The caller was a neighbor who had entered Marshall's house after noticing water flowing beneath the house. The neighbor found Marshall lying face up in the bathtub with the hand-held shower nozzle laying across her stomach. She was naked. Her head was at the end of the tub away from the faucet and her legs lay across the side of the tub. A comb lay in the tub beside her. The cold water was running. Officers found no sign of forced entry into the house.

¶8. After discovering the death, the police investigated a number of people to determine who might have been involved. There were several others who had relations with the victim who were investigated, including her brother who for a while lived with her and whom she had kicked out.

¶9. The police considered Hackman, who was with Shaffer that night, to be a suspect. According to a witness at the Julep Room, Marshall said that night that Hackman was her boyfriend. Hackman was on probation from a prior conviction at the time. Police eliminated him as a suspect after his hair and blood samples had been sent to the crime lab.

¶10. In addition, there was evidence that a late model gray Cadillac was parked in Marshall's yard as late as 6:10 a.m. on the morning of her death. By contrast, Shaffer was driving a 1976 white Buick Century. No witness saw him or his car there at any time after he left her house with Hackman, when Marshall was clearly alive and well.

¶11. Further, there was a question as to whether a murder even occurred. An autopsy was performed on the deceased the day after her body was discovered in the bathtub. The autopsy was videotaped and a transcript made of the discussion that occurred therein. During the autopsy, the pathologist, Dr. Paul McGarry, inquired of the police officers who were assisting in the investigation whether the deceased had been drinking. Detective Don Bourgeois, who was present at the autopsy, told McGarry that she was a heavy drinker and a heavy drug user. At the conclusion of the autopsy, McGarry stated that Marshall appeared to have met her death from "a combination of violence, sexual activity, probably alcohol, probably drugs, extremes of all these things." According to his conclusion, it was probably some sort of "violent sexual involvement of some kind that was not intended to be murder or wound up with her collapsing."

¶12. As illustrated by McGarry's observations at the autopsy, the role of drugs and alcohol was important in determining the cause of Marshall's death. At the autopsy, McGarry drew blood and bile samples upon which toxicology tests could be performed to determine the levels of both. During the preliminary hearing, Detective Bourgeois testified under oath that the tests on the blood and bile revealed a .16 alcohol content and no drugs. At trial, however, Detective Bourgeois testified that, contrary to his earlier representation, no testing had been done. This was the first time the defense learned of the absence of testing and the failure to utilize the samples of bile and blood. At trial, the court would not permit testimony as to Marshall's predilection for drugs and alcohol except for testimony as to drinks Marshall had been seen with on the eve of her death.

¶13. At trial, McGarry testified that Marshall died of asphyxiation. However, he could not name the exact mechanism of the asphyxiation. McGarry stated that the victim had "blunt injury compression blows to the neck" which indicated "that something was very forcefully around the neck." Marshall also had "[e]xtensive bruising on the insides of the lips." According to McGarry, the eight or nine injuries to her head, which were inflicted "[w]ell within an hour" of her death, were inconsistent with

her having slipped and fallen. McGarry also found "injuries consisting of bumps, bruises, abrasions or scrape marks, purple bruise marks on both elbows, both forearms, both wrists, both hands, in a--what is referred to as a defensive pattern."

¶14. Turning to Marshall's vaginal abrasions, McGarry testified that they were "caused by penetration of the vaginal opening, rubbing the skin off the lining of the vagina," and that they had been inflicted "very close to the time of death," i.e., "[w]ithin minutes." The victim had extensive injury to her rectum. The damage indicated a "typical penis penetration." McGarry testified that Marshall "died as a result of being unable to breathe." On cross-examination, McGarry acknowledged that a ruling of death by asphyxiation included "various possibilities." Further he stated that he did not know the precise mechanism of the infliction of asphyxia. This fact did not alter his conclusion that she had died of asphyxia, and that she had died violently. The defense pathologist, Dr. LeRoy Riddick, a state medical examiner for the state of Alabama, testified that the cause of death could not be determined. McGarry stated that the deceased had not been strangled.

¶15. On March 15, Captain Gary Demaree of the Ocean Springs Police Department attended the autopsy and learned, essentially, that the police were confronted with "a brutal rape and murder." This information "narrowed the field [of suspects] down quite a bit." Having determined that Marshall had last been seen alive with Hackman and Shaffer, Demaree and Detective Louie Miller interviewed both men on March 18. Both Hackman and Shaffer denied that either of them had sex with Marshall, and they both said that Marshall was alive when they left her house.

¶16. The next day, March 19, Shaffer and Hackman submitted to the taking of a sexual assault kit at the local hospital. While in the waiting room, Detective Don Bourgeois asked Shaffer if he knew why anyone would leave a body in a bathtub with the water running. Shaffer replied that water would wash away any evidence from the body. He added that all women "wanted" him (Shaffer). Later that day, at the police department, Shaffer gave a statement to Bourgeois and Detective Thurman Windham. In this statement, he originally denied any sexual contact with Marshall, but recanted and stated that he did not remember whether this occurred. Upon further questioning, he stated that he "did penetrate a little bit," but did "not ejaculate." In his statement of March 19, Hackman maintained that he had seen nothing that night which would have led him to believe Shaffer and Marshall had sexual intercourse while he (Hackman) was in the house.

¶17. The defense stipulated that John Lawrence "Jack" Quill, a supervisory special agent of the Federal Bureau of Investigation, was an expert in the field of RFLP (Restriction Fragment Length Polymorphism) DNA analysis. Quill testified that he had received items identified to him as two vaginal swabs and two rectal swabs taken from Marshall's body; semen stains from a sheet taken from Marshall's house; and blood samples from Marshall, Hackman, and Shaffer. After performing his procedures on these samples, Quill "found Rachel Marshall on her vaginal swabs . . . [on] her rectal swabs, . . . [and] on a cutting from the sheet." Regarding Hackman, Quill could "absolutely exclude Mr. Hackman as a contributor to any of those profiles." In other words, he "[d]idn't find him anywhere." Finally, Quill "found Mr. Shaffer on two of the cuttings from the sheet . . . [and] in the vaginal swabs of Rachel Marshall."

¶18. Quill testified that the profile of another individual was present on three of the cuttings from the sheet; in other words, another man--neither Shaffer nor Hackman--had at some point deposited

semen on the sheet. The profile of this third unknown man did not appear on the vaginal swab; nor did it appear on the rectal swab. Quill "could come to no conclusive results on [his] examination of the rectal swabs." However, he

> did in fact see a very light profile of Mr. Shaffer. But, for the purposes of my report, because it was light, I said . . . no conclusive DNA profile results.... I will do everything that I can to be as conservative as I can. So even though I see a very light profile, it's my professional opinion to say that my conclusion was that no conclusive DNA profile results were obtained from the rectal swabs. But you can see I did--from the visual interpretation, I did see a very light profile of Mr. Shaffer that was present on those rectal swabs.

In Quill's opinion, this "light profile" would lend itself to PCR (polymerase chain reaction) DNA testing, which could produce a result with less DNA[1].

¶19. Dr. Sudhir Sinha, a molecular biologist, testified as an expert in the field of forensic DNA testing. Having performed PCR testing on the rectal swab taken from the victim and the sample taken from Shaffer, he could not exclude Shaffer as the source of the sperm found on the rectal slide.

¶20. Deborah Haller, an expert in the field of forensic serology, testified that seminal fluid was present on Marshall's vaginal and rectal swabs and slides. The fitted sheet taken from Marshall's bed contained five distinct semen stains and three blood stains. One of the blood stains "was indicative of ABO blood group A," Marshall's blood type. Type A blood was also found on a pillow case. On the flat sheet, she found human blood which she was unable to type. Haller testified that she "could not rule out Mr. Hackman or Mr. Shaffer as a possible contributor to those seminal fluid stains" on the sheet. Nor could she exclude Hackman or Shaffer as the source of the seminal fluid on the rectal slide. Thus, she forwarded these samples "to the F.B.I. for DNA testing." Regarding the vaginal slides and swabs, she concluded that the contributor was a non-secretor[2]. Thus, she excluded Hackman, a secretor, and included Shaffer, a non-secretor, as a possible source of this seminal fluid.

¶21. Joe Andrews, an expert in the field of microanalysis, had analyzed the known hair samples of Marshall, Hackman and Shaffer, and compared them to samples taken from the scene of the crime. From the side of the bed, he recovered pubic hairs "which exhibited the same microscopic characteristics as the known pubic hairs of Justin Shaffer." He also recovered head hairs matching those of Marshall, and one head hair which matched none of the known samples. No hair from this exhibit matched the known sample from Hackman. The pubic hair taken from the bathtub and the bathtub drain also matched Shaffer's sample. From the hairs taken from the bed linen, Andrews identified a pubic hair and a head hair as matching that of Shaffer; head hairs matching that of Marshall; and head hairs of Caucasian origin which did not exhibit the same characteristics as any of the individuals from which Andrews had known samples. A pubic hair matching that of Shaffer was also found on the bedspread. From Marshall's pubic combing, five hairs were recovered, two of which matched the known pubic hairs of Shaffer, and three of which were her own. Clydell Morgan, the fingerprint expert, testified that the latent print taken from the bathroom sink matched that of Shaffer.

¶22. The indictment charged Shaffer with capital murder--murder in the course of sexual battery. The jury initially was instructed that it could find the defendant guilty of capital murder, guilty of simple murder, guilty of manslaughter, or not guilty. It was not instructed that it could separately find the

defendant guilty of the crime of sexual battery. After deliberating for a period of time, the jury sent a note to the trial judge: "Does a verdict of murder include sexual battery?" The trial judge responded with a note: "Please be more specific and return this paper." The jury then wrote: "If we find the defendant guilty of murder, does that include guilty of sexual battery? And is sexual battery only in a guilty verdict of capital murder and manslaughter and not in a guilty verdict of murder?" With that, the trial judge sent in a new verdict form, labeled Court's Instruction No. C-3. It gave the jury not only the previous options, but the additional options of finding the defendant guilty of the combined crime of "murder and sexual battery," and finding the defendant guilty of the combined crime of "manslaughter and sexual battery." Trial counsel for the defense agreed to this new instruction, as did counsel for the state. After further deliberations, the jury found Shaffer guilty of "murder and sexual battery." The trial court imposed a sentence of life for murder and a consecutive thirty year sentence for sexual battery.

## DISCUSSION OF LAW

### I. WHETHER IT WAS ERROR FOR THE STATE TO AFFIRMATIVELY MISLEAD THE DEFENSE ABOUT THE RESULTS OF EXTREMELY IMPORTANT TESTING OF BLOOD AND BILE FROM THE DECEDENT'S BODY WHEN IN FACT NO TESTING HAD BEEN DONE AT ALL.

¶23. Prior to trial, the defense filed a motion to have the prosecution preserve all evidence. This motion was granted. At the preliminary hearing, Detective Don Bourgeois testified that a chemical analysis performed on Marshall's blood showed an alcohol level of .16. Bourgeois also testified that the drug screen had come back negative. The defense, relying on this testimony, assumed that these important tests had been done and that the results were as they had been disclosed at the pretrial hearing. However, at trial, Shaffer discovered that no tests had been run on Marshall's blood or bile samples. According to Detective Bourgeois, he was "wrong" and had made a "mistake" when he earlier testified about the results at a pretrial hearing.

¶24. The amount, if any, of drugs and alcohol in Marshall's system at the time of her death was crucial information. Without that information, doctors were unable to determine the cause of her death. The initial impression of the prosecution's pathologist, Dr. McGarry, at the conclusion of the autopsy was that the decedent died from "a combination of violence, sexual activity, probably alcohol, probably drugs, extremes of all these things." Dr. McGarry testified that it would have been helpful to know whether Marshall was drunk and/or on drugs at the time of her death but he was never given any results of any tests although he did take samples for that purpose, nor was he notified of her blood alcohol level. He also stated that it was important in determining the origin of her bruises to know whether the victim was drunk, and that alcohol easily could have contributed to such a death. "Alcohol and drug combinations can cause death by themselves with no other factors involved," Dr. McGarry added. "Combined with alcohol and/or drugs, a blow to the body may be enough to cause cessation of breathing without strangulation. Blows in some people with some alcohol, some drugs, can cause cessation of breathing without actual pressure." The evidence shows that Marshall had been drinking heavily in the hours just prior to her death. As Hackman testified, when he and Shaffer left her house, "she was just about to pass out."

¶25. This misleading testimony by Detective Bourgeois about the testing was never corrected by the

attorneys for the state. This Court finds the actions of the detective and the inaction of the prosecutors reprehensible. Shaffer contends that these actions violate Rule 4.06 (a)(4)[3] of the Uniform Criminal Rules of Circuit Court Practice, as well as, his due process rights under the federal and state constitutions. While this Court does not necessarily agree with that argument, we do find these actions appalling if not an ethical violation. This Court has not hesitated, in the past, to punish a party who provides false information in discovery. Nor have we been reluctant to discipline attorneys for either falsifying information or failing to disclose falsity of testimony of their client. *See Mississippi Bar v. Mathis*, 620 So.2d 1213 (Miss. 1993) (attorney suspended for misrepresenting to court and opposing counsel that autopsy had been performed). Although not reversing the case now before us on this issue, this Court finds that condemnation of the actions of the detective and the inactions of the state's attorneys is appropriate.

> **II. WHETHER IT WAS ERROR FOR THE TRIAL COURT TO PROHIBIT THE DEFENSE FROM INTRODUCING IMPORTANT EVIDENCE ABOUT THE DECEDENT'S CONSUMPTION OF ALCOHOL AND DRUGS AND TO PREVENT THE DEFENSE FROM CROSS-EXAMINING THE STATE'S EXPERT ABOUT INFORMATION HE HAD IN THAT CONNECTION AND UPON WHICH HE HAD RELIED.**

¶**26.** During the cross-examination of the state's expert, Dr. McGarry, he was asked whether he received any information as to whether the deceased was drunk just prior to her death. McGarry testified that he received no information with regard to the decedent's "blood alcohol or level of intoxication." He then stated that, during the autopsy, he asked those present about Marshall's alcohol usage. As Dr. McGarry explained, "[t]hat's the purpose of people being present at the autopsy, to provide me with information if I ask for it." At this point, the prosecution objected and obtained a ruling that the defense would not be permitted to ask about the statements of officers present during the autopsy concerning Marshall's alcohol intake or propensity for drug use. The trial court found that the evidence was inadmissible hearsay. The defendant argues that he should have been allowed to question Dr. McGarry about the basis of his expert analysis and opinions, including the opinion he delivered at the autopsy. Moreover, the transcript of the autopsy confirms that Detective Bourgeois told Dr. McGarry that Marshall was a "hard drinker" and a "known heavy drinker" who had been drinking the night of her death, as well as a "drug user" who used cocaine and marijuana. Relying on these statements and his examination of the body, Dr. McGarry concluded at the end of the autopsy that "probably alcohol" and "probably drugs" contributed to the death of Marshall, which Dr. McGarry said was "not intended to be murder."

¶27. The trial court prevented the defense from cross examining McGarry with respect to information he had or that he asked for at the autopsy about Marshall's drinking habits and her intake that night. The right to confront and cross-examine the witnesses against him is one guaranteed to all defendants under the Sixth Amendment of the United States Constitution and Article 3, Section 26 of the Mississippi Constitution. *Suan v. State*, 511 So. 2d 144, 148 (Miss. 1987) (accused has right to broad and extensive cross-examination); *Hamburg v. State*, 248 So. 2d 430, 434 (Miss. 1971) (right to confront and cross-examine accuser is broad and fundamental). Furthermore, Rule 705 of the Mississippi Rules of Evidence requires that underlying facts or data behind an expert's opinion or inferences must be disclosed on cross-examination. As Rule 703 indicates, this disclosure is required even if those facts or data are not otherwise admissible in evidence. Rule 705 reads as follows:

The expert may testify in terms of opinion or inferences and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Miss.R.Evid. 705. Rule 703 of the Mississippi Rules of Evidence reads as follows:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Miss.R.Evid. 703.

¶28. This Court found the same to be true in *City of Laurel v. Upton*, 253 Miss. 380, 175 So.2d 621 (1965) (holding that reports, letters and the opinion of another doctor upon which an expert relied in reaching his opinion are admissible and the expert may be cross-examined thereto). In that case, the defendants attempted to introduce into evidence a letter on which plaintiff's doctor had based, in part, his opinion. The trial court refused to allow the document to be introduced into evidence. This Court reversed stating that:

appellants had the right to cross-examine [the doctor] relative to these reports and letters and to introduce them into evidence if they so desired. In every case where an expert witness is allowed to express an opinion such witness is subject to cross-examination as to the basis of his opinion.

. . . .

We do hold that appellant had the right to cross-examine [the doctor] relative to any matters which he used and considered in reaching his findings and to introduce such matters into evidence if they so desired.

**Id.** at 392-93; *City of Laurel,* 253 Miss. at 392-93, 175 So.2d at 625. This Court held the same in *Williams v. Dixie Electric Power Ass'n*, 514 So.2d 332 (Miss. 1987).

¶29. In the case *sub judice,* the evidence concerning alcohol and drug use was provided by police officers in their investigation of the case. Moreover, this evidence was of the type generally relied on by pathologists in determining cause of death, and therefore was admissable under Rules 705 and 703.

¶30. This Court finds that refusal to allow the defense to cross-examine the state's expert to be reversible error. Specifically, we find that the trial court's denial of the defense to cross-examine the state's expert, Dr. McGarry, about information he received during the autopsy regarding Marshall's intake of drugs and alcohol on the night of her death constitutes reversible error.

### III. WHETHER IT WAS ERROR FOR THE TRIAL COURT TO INSTRUCT THE JURY ON DEPRAVED HEART MURDER WITHOUT REQUIRING THE JURY TO FIND THE STATUTORY ELEMENT OF A DEPRAVED HEART, ACTING REGARDLESS OF HUMAN LIFE.

¶31. The jury found Shaffer guilty of murder as defined in Miss. Code Ann. § 97-3-19(1)(b).

> (1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:
>
> . . .
>
> (b) When done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual.

Miss. Code Ann. § 97-3-19(1)(b) (1994). However, the jury was given an instruction that failed to include the element of "evincing a depraved heart, regardless of human life." The state argues that because Shaffer objected to the instruction upon different grounds at trial, he is now procedurally barred from raising this issue on appeal. We disagree. Instructing the jury on every element of the charged crime is so basic to our system of justice that it should be enforced by reversal in every case where inadequate instructions are given, regardless of a failure to object or making a different objection at trial.

> "Just as the State must prove each element of the offense, the jury must be correctly and fully instructed regarding each element of the offense charged." Failure to submit to the jury the essential elements of the crime is "fundamental" error. . . .Indeed,
>
> "[i]t is axiomatic that a jury's verdict may not stand upon uncontradicted fact alone. The fact must be found via jury instructions correctly identifying the elements of the offense under the proper standards." "Where the jury had incorrect or incomplete instructions regarding the law, our review task is nigh unto impossible and reversal is generally required."
>
> It is rudimentary that the jury must be instructed regarding the elements of the crime with which the defendant is charged. . . .Reversal on this issue is warranted.

*Hunter v. State*, 684 So.2d 625, 636 (Miss. 1996) (internal citations omitted). In *Hunter* we found that reversible error occurred even though the defendant had not submitted a suitable instruction, because "the State was obligated to do so." *Id*. The jury was not instructed on an essential element of the crime charged, denying Shaffer of his fundamental right to due process.

¶32. A conviction is not valid where the prosecution does not prove each element of the charged offense beyond a reasonable doubt. *Davis v. State*, 586 So.2d 817, 819 (Miss. 1991) It follows that a conviction is unenforceable where the jury does not find each element of the offense beyond a reasonable doubt. Where the jury is not even instructed on one of the vital elements of the offense, the conviction must not survive the scrutiny of this Court.

¶33. Eliminating the element of "evincing a depraved heart, regardless of human life" from the jury instruction on depraved heart murder in this case constituted reversible error. This Court, therefore finds that the conviction of murder and sentence of life imprisonment should be reversed and the matter should be remanded to the Jackson County Circuit Court for a new trial.

**IV. WHETHER IT WAS ERROR TO SUBMIT TO THE JURY THE COMBINATION CRIME OF "MURDER AND SEXUAL BATTERY" AS A SINGLE VERDICT OPTION, WITHOUT SUBMITTING THEM AS SEPARATE VERDICT OPTIONS, WHEN MISSISSIPPI LAW DOES NOT PROVIDE FOR SUCH A COMBINATION CRIME.**

¶34. Shaffer's final argument which this Court wishes to discuss is that the trial court, in presenting a combination option of "murder and sexual battery" to the jury, (a combination that does not exist under any statute) exceeded its authority and invaded the province of the Legislature.

¶35. The indictment charged Justin Shaffer with capital murder, murder in the course of sexual battery. The jury initially was instructed that it could find the defendant guilty of capital murder, guilty of simple murder, guilty of manslaughter, or not guilty. It was not instructed that it could separately find the defendant guilty of the distinct crime of sexual battery. After deliberating for a period of time, the jury sent a note to the trial judge: "Does a verdict of murder include sexual battery?" The trial judge responded with a note: "Please be more specific and return this paper." The jury then wrote: "If we find the defendant guilty of murder, does that include guilty of sexual battery? And is sexual battery only in a guilty verdict of capital murder and manslaughter and not in a guilty verdict of murder?" With that, the trial judge sent in new verdict form, labeled Court's Instruction No. C-3. It gave the jury not only the previous options, but the additional options of finding the defendant guilty of the combined crime of "murder and sexual battery," and finding the defendant guilty of the combined crime of "manslaughter and sexual battery." Trial counsel for the defense agreed to this new instruction, as did counsel for the state.

¶36. After further deliberations the jury found Shaffer guilty of "murder and sexual battery." The trial court imposed a sentence of life for murder and a consecutive 30 year sentence for sexual battery.

¶37. In Mississippi there is no crime of "murder and sexual battery" or "manslaughter and sexual battery." Further, the trial court does not have the power to fashion a new crime. "[T]he power to define crimes and prescribe punishments is legislative in nature and is constitutionally vested in the legislature of this state." *Windham v. State*, 602 So.2d 798,807 (Miss. 1992) (Robertson, J., concurring). *Accord Faraga v. State*, 514 So.2d 295, 302 (Miss. 1987); *Allen v. State*, 440 So.2d 544, 545 (Miss. 1983).

¶38. It is true that the trial counsel for the defense agreed to the submission of this option to the jury. However, neither defense counsel nor the prosecutor nor the judge can permit what the law does not allow. There is no combination crime of "murder and sexual battery" and the trial court committed error in allowing its submission to the jury.

## CONCLUSION

¶**39.** This Court finds that the trial court's denial of the defense to cross-examine the state's expert, Dr. McGarry, about information he received during the autopsy regarding Marshall's intake of drugs and alcohol on the night of her death was error. We further hold that the failure to instruct the jury on the elements of the underlying crime of murder, specifically, eliminating the element of "evincing a depraved heart, regardless of human life" from the jury instructions on depraved heart murder, constitutes reversible error.

¶40. This case is reversed and remanded for a new trial and proceedings consistent with this opinion.

¶41. **REVERSED AND REMANDED FOR A NEW TRIAL. SENTENCE IS VACATED.**

**PRATHER, C.J., SULLIVAN, P.J., BANKS, McRAE, ROBERTS, MILLS AND WALLER, JJ., CONCUR. SMITH, J., CONCURS IN RESULT ONLY.**

1. On the issue of the PCR method, Quill testified that the FBI had begun accepting this method in 1992, after Quill had performed his tests in this case.

2. There are two different ways to group a person's body fluids--as a secretor or a non-secretor. If a person is determined to be a secretor, then his ABO blood group may be determined from a body fluid such as seminal fluid, vaginal fluid, or saliva. If a person is determined to be a non-secretor, then his ABO blood group may only be determined by a sample of the person's blood. A non-secretor's body fluids would not show his blood group.

3. Under the new rules, this is Rule 9.04.