HECHT, Justice
(concurring in part and dissenting in part).
I agree with the majority on the procedural question, but disagree on the substantive one. In my view, the majority has overlooked the nuances attending Core Group’s petition and the important differences between workers’ compensation cases and general civil litigation. Because I find the majority’s reasoning unpersuasive, I respectfully dissent in part.
The majority relies on rules of statutory interpretation to interpret section 85.27(2), but omits one very important rule specifically applicable in workers’ compensation cases: “a fundamental purpose of the workers’ compensation statute is to benefit ... injured workers.” Jacobson Transp. Co. v. Harris, 778 N.W.2d 192, 197 (Iowa 2010); accord Xenia Rural Water Dist. v. Vegors, 786 N.W.2d 250, 257 (Iowa 2010) (“We apply the workers’ compensation statute broadly and liberally in keeping with its humanitarian objective....”); Griffin Pipe Prods. Co. v. Guarino, 663 N.W.2d 862, 865 (Iowa 2003) (“[T]he primary purpose of chapter 85 is to benefit the worker and so we interpret this law liberally in favor of the employee.”). Applying the statute broadly and liberally consistent with our longstanding practice, I conclude the commissioner’s interpretation of section 85.27 is correct. Accordingly, I would affirm the decisions of the district court and the court of appeals.
I. Whether Section 85.27(2) Applies to Surveillance Materials.
The majority concludes the phrase “all information” in section 85.27(2) means “all medical information” and “the employee’s physical or mental condition” actually means “the employee’s past physical or mental condition.” See Iowa Code § 85.27(2). It does so on the ground that other subsections of section 85.27 are more directly applicable in particular medical contexts, and because the bill book containing the house file enacted in 1976 features an explanation stating the bill made revisions “concerning a person’s past physical or mental condition.” H.F. 863, 66th G.A., 2d Sess. explanation (Iowa 1976). I disagree.
I would not read implied limitations into section 85.27(2) because I conclude “all information” really means all information. “[T]he word ‘all’ has an important use. If it has no significance ... it might as well be dropped from the language as superfluous.” Parsons v. Parsons, 66 Iowa 754, *81 762, 24 N.W. 564, 565 (1885). “AH” has a plain meaning that “is commonly understood and usually does ■ not admit of an exception, addition or exclusion.” Consol. Freightways Corp. of Del. v. Nicholas, 258 Iowa 115, 121, 187 N.W.2d 900, 904 (1965). When a statute contains the word “all,” this court has said it sees “no logical reason to' hold [the statute] means less than it says.” Cedar Rapids Cmty. Sch. Dist. v. City of Cedar Rapids, 252 Iowa 205, 211, 106 N.W.2d 655, 659 (1960).
The decisions of this court have given the word “all” a very broad meaning. See, e.g., Luttenegger v. Conseco Fin. Servicing Corp., 671 N.W.2d 425, 434 (Iowa 2003); Barron v. State Farm Mut. Auto. Ins. Co., 540 N.W.2d 423, 426 (Iowa 1995); In re Peers’ Estate, 234 Iowa 403, 411, 12 N.W.2d 894, 898 (1944); Grimes v. Nw. Legion of Honor, 97 Iowa 315, 324, 64 N.W. 806, 808 (1895) (“[T]he legislature, by the use of the words ‘all insurance companies or associations,’ intended to cover every form of insurance.”); State v. Hutchison, 72 Iowa 561, 562-63, 34 N.W. 421, 421 (1887) (concluding a statutory prohibition against “all intoxicating liquors whatever” included alcoholic cider manufactured from apples). I would again give the word a broad meaning in this case.
I find our decision in Consolidated Freightways instructive. See Consol. Freightways Corp., 258 Iowa at 121, 137 N.W.2d at 904. There we concluded the plain meaning of the word “all” rebutted a contention “that the words ‘all states’ and ‘total fleet miles’ ... refer to ‘all apportioning states’ and to ‘total fleet miles in apportioning states.’ ” Id. I similarly reject the majority’s conclusion that in the context of section 85.27(2) “all information” actually means “all medical information” and “the employee’s physical or mental condition” actually means “the employee’s past physical or mental condition.” See Iowa Code § 85.27(2). We should “not write such ... provisional into the statute in the guise of interpretation.” Clarke Cnty. Reservoir Comm’n v. Abbott, 862 N.W.2d 166, 177 (Iowa 2015).
I acknowledge that in some cases we have concluded the word “all” meant something short of all-inclusive. See, e.g., In re Estate of Troester, 331 N.W.2d 123, 126 (Iowa 1983); Johnson v. Bd. of Adjustment, 239 N.W.2d 873, 880-81 (Iowa 1976); Silver Lake Consol. Sch. Dist. v. Parker, 238 Iowa 984, 997, 29 N.W.2d 214, 221 (1947); In re Licenses for Sale of Used Motor Vehicles, 179 N.W. 609, 611 (Iowa 1920). The majority concludes these cases are a sufficient counterweight to the truism that all means all. Notably, however, none of these cases in which we concluded the word “all” meant something less than all-inclusive presented a question requiring interpretation of our workers’ compensation statute.
When deciding workers’ compensation issues, this court has consistently refused to read terms into chapter 85 that are not there expressly, because doing so would create a narrow construction incompatible with . the statute’s benevolent' purpose. See, e.g., Holstein Elec. v. Breyfogle, 756 N.W.2d 812, 816 (Iowa 2008); Cedar Rapids Cmty. Sch. v. Cady, 278 N.W.2d 298, 299 (Iowa 1979); Disbrow v. Deering Implement Co., 233 Iowa 380, 392, 9 N.W.2d 378, 384 (1943); see also Andover Volunteer Fire Dep’t v. Grinnell Mut. Reins. Co., 787 N.W.2d 75, 88 (Iowa 2010) (Hecht, J., concurring specially) (writing separately to question an interpretation of a statute that “results in an embellishment of the words chosen by the legislature”). Unfortunately, today’s majority is not faithful to this well-established maxim.
Despite the indisputably broad language in section 85.27(2) and the notion that chapter 85 should be interpreted broadly, *82 the majority concludes the words “all information” in section 85.27(2) must mean something less than all information because the legislature placed them among other subsections referring to medical treatment for work-related injuries. I disagree. The legislature could, of course, have narrowly limited the scope of information' released under subsection (2) to “records of medical services.” But it did not. See Nelson v. Lindaman, 867 N.W.2d 1, 10, (Iowa 2015) (concluding a statute should be interpreted broadly because if the legislature wanted to limit the statute’s scope, “it would have said so, as it has in other statutes”). The legislature chose instead to define the release broadly to include “all information to which the employee, employer, or carrier has access concerning the employee’s physical or mental condition relative to the claim.” Iowa Code § 85.27(2). It is in my view perfectly sensible that the legislature intended a broad understanding of the words “all information” in this context. Surveillance showing a workers’ compensation claimant’s physical activity can provide information that is exquisitely relevant to the determination of physical capacity and disability — matters which depend in significant part upon medical opinions and substantially impact medical diagnosis and treatment. Accordingly, I conclude the commissioner correctly interpreted “all information” in subsection (2) to include surveillance information.
I also find unpersuasive the majority’s conclusion that the commissioner’s interpretation of section 85.27(2) would lead to absurd results. There is nothing absurd about a statutory framework requiring all parties to a workers’ compensation case to open their files and release all information about the claimant’s physical or mental condition. The commissioner’s interpretation requiring such disclosure comports quite comfortably with the purpose of workers’ compensation. proceedings — to enable prompt, inexpensive resolution of claims. See Flint v. City of Eldon, 191 Iowa 845, 847, 183 N.W. 344, 345 (1921) (noting the purpose and intent of workers’ compensation “is to avoid litigation, lessen the expense incident thereto, ... and afford an efficient and speedy tribunal to determine and award compensation”). That purpose is more likely achieved when parties are required to reveal to each other all information relevant to claimants’ physical or mental condition, rather than holding some of it back in the hope of maximizing a potential litigation advantage.
The majority’s assertion that the commissioner’s interpretation of section 85.27(2) would jeopardize a wide array of privileges is unconvincing. The declaratory order in fact addresses a single privilege — work product — not several. Indeed, the waiver of that single privilege under the commissioner’s interpretation of the statute is limited to a very narrow category of information including only surveillance and does not purport to address whether spousal communications or priest-penitent conversations must be released. The scope of the disclosures required by the commissioner’s order is further limited by its preservation of work product protection for the mental impressions and conclusions of employers, their insurers, or their attorneys. Thus, under the commissioner’s interpretation of section 85.27(2), the sky would not fall and the evidentiary floodgates would not open. Surveillance information left unprotected by the work product privilege would only include videos, photographs, and surveillance reports evidencing the physical or mental condition of the claimant.
I also dispute that the bill book explanation of the statute in 1976 referring to “past physical or mental condition” sup *83 ports the majority’s reasoning in this case. Because surveillance is “typically conducted after a claim has been brought,” the majority concludes the general assembly did not include surveillance information within the universe of information that must be released under section 85.27(2). But this temporal analysis does not hold together when placed in the practical context of workers’ compensation cases. Surveillance materials, like medical records and reports, address a claimant’s physical or mental condition as of a particular moment in time. At all times after such materials, records, and reports have been created, they are accurately described as evidencing a past condition of the claimant. Thus, under section 85.27(2), parties must release all relevant medical records and reports pertaining to workers’ compensation claimants whether they were generated before or after the injury that is the subject of the proceeding — or before or after the workers’ compensation contested case was commenced — because they are .“past records” by the time they are released. This statutory requirement to release all relevant medical records without regard to temporal considerations is essential to proper processing and management of claims. For this reason, I believe the word “past” in the bill book explanation cannot plausibly deserve the significance suggested by the majority. Because the general assembly must have intended in section 85.27(2) that all relevant medical records be released by all parties without regard to when they were generated because they evidence the physical or mental condition of the claimant, I believe the commissioner correctly concluded all surveillance materials and reports probative of physical or mental condition must be released upon request.
Furthermore, the majority’s reliance on the 1976 legislative explanation ignores well-established principles of statutory interpretation: We determine legislative intent “by what the legislature- said, rather than what it should or might have said.” Iowa R.App. P. 6.904(3)(to ) (providing this rule of statutory interpretation is “so well established that authorities need not be cited” to support it); see also Iowa Code § 4.6(3), (7) (permitting courts interpreting a statute to consider legislative history and statements of policy only if the statute itself is ambiguous). Here, “the word ‘all’ ... is not limited in any way. That is clear, so we need not engage in statutory construction.” Barron, 540 N.W.2d at 426. Additionally, “[t]he legislature enacts the bill — not the accompanying explanation.” Star Equip., Ltd. v. State, 843 N.W.2d 446, 454 n. 3 (Iowa 2014). I see a significant difference between the accompanying explanation of section 85.27(2) and other indications of legislative intent expressly approved by the legislature and included within — not just alongside — a particular enactment. See, e.g., LSCP, LLLP v. Kay-Decker, 861 N.W.2d 846, 861 (Iowa 2015); Roberts Dairy v. Billick, 861 N.W.2d 814, 820 (Iowa 2015).
There is yet another problem with the majority’s interpretation of section 85.27(2) limiting the waiver to the claimant’s interest in confidentiality of medical records: It renders part of section'85.27(2) superfluous. See Rojas v. Pine Ridge Farms, L.L.C., 779 N.W.2d 223, 231 (Iowa 2010) (“We ... presume the legislature included all parts of the statute for a purpose, so we will avoid reading the statute in a way that would make any portion of it redundant or irrelevant.”). Section 85.27(2) expressly extends the interests waived to those of “[a]ny employee, employer, or insurance carrier making or defending a claim for benefits.” Iowa Code § 85.27(2) (emphasis added). But if, as the majority concludes, the waiver implemented in section 85.27(2) is limited to medical records and informa *84 tion for which a claimant could claim a physician-patient privilege, employers and their insurance carriers will never be subject to it. Employers and their insurance carriers have no physician-patient privilege in such information to waive, and their inclusion in section 85.27(2) among those waiving an interest would be entirely superfluous. We should give effect to every part of the statute, if possible. See Rojas, 779 N.W.2d at 231; Beier Glass Co. v. Brundige, 329 N.W.2d 280, 285 (Iowa 1983) (“[W]e construe a statute ... based on our presumption the legislature intended every part for a purpose.”). The commissioner’s declaratory order gives effect to the words “employer or insurance carrier” by correctly concluding the waiver effected by the statute requires release of surveillance information evidencing a claimant’s physical or mental condition.
The majority dismisses this point by suggesting the legislature really meant to impose the waiver under section 85.27(2) only on employees but obscured that intent in favor of “cleaner” language expressly imposing it on all parties to workers’ compensation cases. In my view, this explanation is doubtful at best. As noted above, it fails completely to account for the general assembly’s language waiving the employer and insurer’s privilege in information. The majority’s solution of the problem is to write out of the statute the troublesome words expressly eliminating a privilege otherwise held by employers and their insurance carriers. I believe the commissioner’s understanding of the statute — one consistent with the canon that we interpret statutes to give meaning to all their words when possible — breathes life into all of its words. Because the employer or insurer has no protected or protectable interest in the claimant’s medical records whether the claimant possesses them or not, I conclude the general assembly must have intended a waiver of some interest other than the physician-patient privilege. I find the commissioner’s interpretation of section 85.27(2) more persuasive than the majority’s in part because it gives meaning to the words of the statute extending the waiver to surveillance information held by the employer or its insurance carrier — information that would otherwise be protected by the work product doctrine.
II. Whether Section 85.27(2) Waives Work Product Protection.
Tjie majority concludes section 85.27(2) cannot effect a waiver of work product protection because the work product doctrine provides qualified immunity from discovery rather than a “privilege.” This characterization of the work product doctrine emphasizes form over substance and adopts a semantic label without considering how work product protection actually operates.
A. Limited Scope of Inquiry. I do not dispute that there are “two tiers of work product recognized by Iowa rule 1.503(3).” Keefe v. Bernard, 774 N.W.2d 663, 674 (Iowa 2009). I also do not dispute that surveillance materials constitute work product in the civil litigation context because they are documents or tangible things prepared by or for a party in anticipation of litigation. See Iowa R. Civ. P. 1.503(3). However, the types of surveillance materials for which Core Group requested a declaratory order — videos, photos, and factual reports — will never fall within the upper tier of work product, because they do not reveal mental impressions and conclusions. Accordingly, the majority’s warning that section 85.27(2) might waive other privileges — for example, priest-penitent privilege — and the inconsistency it perceives in the commissioner’s ruling are in my view red herrings.
*85 The commissioner’s ruling did not need to explain which part of section 85.27(2) justifies a distinction between upper-tier and lower-tier work product because the distinction does not flow from the statute at all; it flows from the nature of the materials and their obvious relevance to a claimant’s physical or mental condition. Further, as I have already noted, the commissioner’s declaratory order proceeding did not address any other privileges. Accordingly, there is no need to address other privileges in our decision because their continuing vitality in workers’ compensation cases was not at issue in the agency and is not before the court on appeal. See Morrison v. Century Eng’g, 434 N.W.2d 874, 876-77 (Iowa 1989) (addressing only the physician-patient privilege because that was the only question presented); see also Eugene Volokh, The Mechanisms of the Slippery Slope, 116 Harv. L. Rev. 1026, 1137 (2003) (“The slippery slope is in some ways a helpful metaphor, but as with many metaphors, it starts by enriching our vision and ends by clouding it.”); cf. State v. Thompson, 836 N.W.2d 470, 495 n. 8 (Iowa 2013) (Appel, J., concurring specially) (resisting “any slippery-slope-type argument regarding ... other privileges” because “the only issue before the court involves the application of [a particular statute] ... to the facts at hand”).
B. Immunity Versus Privilege. The majority concludes section 85.27(2) does not eliminate work product protection for surveillance information because the work product doctrine provides immunity from discovery rather than an evidentiary privilege. The terms “immunity” and “privilege” have been used alternatively in our caselaw. The majority suggests our alternating use of the terms merely illustrates that the court’s word choices are occasionally imprecise. I can accept that premise, but only if we also accept that the general assembly uses imprecise language on occasion, too, and that it may have done so in this particular statute. Unlike the majority, I do not presume the general assembly’s use of the word “privilege” and the Institute’s characterization of work product protection as a procedural immunity are dispositive of the issue before us.[9] Instead, I evaluate substance rather than form — and because work product protection operates in practice in the same manner as other evidentiary privileges, I consider it a privilege for purposes of section 85.27(2).
In a general sense, both “privilege” and “immunity” concepts place the burden of proof on the party asserting protection. See Anderson v. State, 692 N.W.2d 360, 364 (Iowa 2005) (discretionary function immunity); AgriVest P’ship v. Cent. Iowa Prod. Credit Ass’n, 373 N.W.2d 479, 482 (Iowa 1985) (“One resisting discovery through assertion of a privilege has the burden to show the privilege exists and applies.”). But, once established, an immunity leads courts to only one possible conclusion, while a privilege does not. In other words, an opposing party cannot override a claim of immunity based upon their substantial need for information or other ground; they can only assert the immunity does not apply. But an opponent' can override an adversary’s claim of privilege with a proper showing. See, e.g., In re A.M., 856 N.W.2d 365, 373 (Iowa 2014) (applying a statutory exception to the psychotherapist-patient privilege); *86 State v. Countryman, 572 N.W.2d 553, 561 (Iowa 1997) (recognizing two exceptions to the marital-communications privilege); Chung v. Legacy Corp., 548 N.W.2d 147, 150-51 (Iowa 1996) (exploring the patient-litigant exception that overrides the physician-patient privilege when the party claiming the privilege places their condition at issue).
The framework of rule 1.503(3) best fits the privilege framework. Although a party can establish that a requested document or item is protected work product, the party seeking that document or item can still obtain it upon a showing of substantial need and undue hardship. See Iowa R. Civ. P. 1.503(3). Because the work product doctrine, like evidentiary privileges, is subject to override upon an opponent’s proper showing, it is more like a privilege than an immunity. Cf. Bob McKiness Excavating & Grading, Inc. v. Morton Bldgs., Inc., 507 N.W.2d 405, 411 (Iowa 1993) (looking “beyond the labels to the actual nature of the action” to determine the applicable statute of limitations); Essex Ins. Co. v. Fieldhouse, Inc., 506 N.W.2d 772, 775 (Iowa 1993) (examining substance rather than form “[rjegardless of the label”). I reject the majority’s conclusion that the “immunity” label is dispos-itive of the issue before us, preferring instead an analytical framework that examines the substance of the question rather than its form.
I acknowledge that work product materials including surveillance are often in the possession of attorneys rather than the employers and insurance carriers they represent. The majority concludes clients cannot unilaterally waive the work product doctrine as to materials in their attorneys’ possession. Yet, the waiver under section 85.27(2) is effected by the statute, not by employers’ or insurers’ unilateral actions. More importantly, parties to workers’ compensation proceedings must, under the statute, release not only information they have in their possession, but also information to which they have access. Parties to workers’ compensation proceedings have access to surveillance videos, photographs, and reports in the possession of their attorneys. Accordingly, I believe the clear language of the statute extends the limited waiver of the work product privilege to surveillance materials in the possession of attorneys for employers and their insurance carriers.
III. Timing of Disclosure.
Previous agency decisions had concluded that postponing disclosure until after the claimant’s deposition preserved impeachment value. However, agency decisions interpreting the law are not binding on this court. Keystone Nursing Care Ctr. v. Craddock, 705 N.W.2d 299, 304 n. 2 (Iowa 2005) (“[Tjhe commissioner’s final decision is judged against the backdrop of the workers’ compensation statute and the Iowa appellate cases interpreting it, not previous agency decisions.”). And until today, we had not confronted a case presenting the temporal question at issue here.
Surveillance materials undoubtedly have some impeachment value. See Snead v. Am. Exportr-Isbrandtsen Lines, Inc., 59 F.R.D. 148, 150 n. 1 (E.D.Pa.1973) (“It is in the best interests of society that valid claims be ascertained and fabricated claims be exposed.”). However, “surveillance footage ... is hardly a smoking gun,” even when it depicts a claimant “performing tasks inconsistent with the claimed disability.” Cedar Rapids Cmty. Sch. Dist. v. Pease, 807 N.W.2d 839, 848-49 (Iowa 2011).
Two Louisiana cases illustrate the important competing interests at stake in determining whether predeposition disclo *87 sure is appropriate. In Moak v. Illinois Central Railroad, the Louisiana Supreme Court concluded the timing of disclosure should turn on “when the production of surveillance films, tapes or photographs will most likely assist the search for truth.” Moak v. Ill. Cent. R.R., 631 So.2d 401, 406 (La.1994). The court determined predeposition disclosure is often appropriate:
While ... surprise may have a healthy prophylactic effect against possible perjury, it is more likely that the adversarial process will function efficiently and cases will be decided fairly on the merits if the parties are aware of all the evidence. Furthermore, discovery of surveillance materials permits the kind of stipulations and admissions required for effective pre-trial procedures. It also encourages settlement or abandonment of less than meritorious claims.
Id. at 405 (citation omitted) (internal quotation marks omitted).
Several years later, the Louisiana Supreme Court distinguished Moak. Wolford v. JoEllen Smith Psychiatric Hosp., 693 So.2d 1164, 1166-67 (La.1997). The court concluded the unique impeachment value of surveillance justifies a per se rule preventing disclosure before the plaintiffs deposition. See id. at 1167. The court explained:
Surveillance videotape picturing the plaintiff engaged in physical activity has the potential to reveal inconsistencies between the plaintiffs claimed injuries and resulting limitations and the plaintiffs actual abilities. However, any potential impeachment value would be destroyed by ordering pre-deposition disclosure of such surveillance materials. If the plaintiff were to view the surveillance videotape prior to being deposed as to his physical injuries and limitations during the time period pictured in the videotape, he would be more likely, either inadvertently or deliberately, to tailor his testimony to correspond with the actions pictured in the videotape.... [Delaying the production of the videotape until after the plaintiff has been fully deposed aids in the search for the truth.

Id.

The majority relies on many other cases that essentially utilize the Wolford rule (or something like it) and allow defendants to withhold surveillance materials until after deposing the plaintiff. See, e.g., Smith v. Diamond Offshore Drilling, Inc., 168 F.R.D. 582, 587 (S.D.Tex.1996); Boyle v. CSX Transp., Inc., 142 F.R.D. 435, 437 (S.D.W.Va.1992); Dodson v. Persell, 390 So.2d 704, 708 (Fla.1980). But these cases constituting what the majority characterizes as a consensus are not persuasive here for several significant reasons.
First, not all courts prioritize impeachment value over “the free flow of information.” See Morrison, 434 N.W.2d at 876. For example, one New York court stated:
Although it is possible that a plaintiff will attempt to tailor his or her testimony after learning what the surveillance films reveal, it seems unlikely that he or she would risk going to trial knowing that the films are accurate.... We believe it is more likely that disclosure will result in a settlement, or possibly a voluntary discontinuance of the lawsuit, in either case avoiding costly and time consuming litigation.
Kane v. Her-Pet Refrigeration, Inc., 181 A.D.2d 257, 587 N.Y.S.2d 339, 344 (1992); see also Wegner v. Cliff Viessman, Inc., 153 F.R.D. 154, 159-60 (N.D.Iowa 1994) (“[Requiring discovery of surveillance by defendants ... will not jeopardize' the ability of defendants to impeach plaintiffs.”); Shields v. Burlington N. & Santa Fe Ry., 353 Ill.App.3d 506, 288 Ill.Dec. *88 916, 818 N.E.2d 851, 856 (2004) (“[W]e see no need for special treatment of the substantive evidence in a surveillance videotape.”); Williams v. Dixie Elec. Power Ass’n, 514 So.2d 332, 335 (Miss.1987) (“Once an opponent requests discoverable material, an attorney has a duty to comply with the request regardless of the advantage a surprise may bring.”).
Second, surveillance materials sometimes are not fairly described as a smoking gun. See Pease, 807 N.W.2d at 848. In a personal injury case, the New Jersey Supreme Court addressed and rejected an assertion that requiring disclosure of surveillance materials would render them toothless for impeachment purposes:
[Djefendants’ position suffers from an obvious analytical weakness: it is based on the premise that defendants’ evidence (in the form of the undercover films) is the exclusive repository of truth and virtue and its disclosure ... will deprive them of the opportunity to demonstrate ... the fraud plaintiff seeks to work upon them. While defendants do not state that assumption quite so bluntly, their argument rests upon it at least implicitly. The premise is one we can hardly indulge. It is no more unlikely that a defendant may resort to chicanery in fabricating motion pictures of one alleged to be the plaintiff than it is that a plaintiff may indeed be a faker.
Jenkins v. Rainner, 69 N.J. 50, 350 A.2d 473, 476-77 (1976); see also Boyle, 142 F.R.D. at 437 (“[Tjhose surveilled may be tempted to alter the truth, but ... those conducting the surveillance may be subject to the same temptation.... ”); Snead, 59 F.R.D. at 150 (questioning the purportedly unassailable nature of surveillance materials because “[a]n emergency situation may be made to appear commonplace” and a one-time event can be made to appear recurring); Orgeron v. Tri-State Road Boring, Inc., 434 So.2d 65, 68 (La.1983) (“[Pictures or videotapes must be approached with great caution because they show only intervals of the activities of the subject, they do not show rest periods, and do not reflect whether the subject is suffering pain.... ”).[10]
Furthermore, as the Core Group suggests, in some instances surveillance information has. no impeachment value whatsoever because it is probative of the physical impairment claimed by an injured employee. And even when surveillance information does have impeachment value, “if [it is] at all effective will [it] not also be substantive evidence going directly to ... injuries and damages?” Spencer v. Beverly, 307 So.2d 461, 462 (Fla.Dist.Ct.App. 1975) (Downey, J., specially concurring). Whether or not such information has impeachment value, it is in my view probative of a claimant’s physical or mental condition and the commissioner therefore correctly declared it should be released under section 85.27(2) when requested. See Iowa Code § 85.27(2).
But most importantly, as I have already noted, cases adjudicating discovery disputes between plaintiffs and defendants engaged in civil litigation are qualitatively *89 different from workers’ compensation cases involving claimants and employers or insurers. Unlike personal injury actions sounding in tort or statutory actions brought under the Federal Employers’ Liability Act, the workers’ compensation system “is designed to be essentially nonad-versarial.” Morrison, 434 N.W.2d at 877; see also Flint, 191 Iowa at 847, 183 N.W. at 345 (noting the workers’ compensation system is designed to “avoid litigation ... and afford an efficient and speedy tribunal”). Thus, when considering decisions from other courts resolving work product disputes, I strongly agree with those prioritizing “the free flow of information regarding a worker’s physical or mental condition relative to a compensation claim.” See Morrison, 434 N.W.2d at 876. Sometimes the difference between types of cases is crucial. See Williams-Yulee v. Fla. Bar, — U.S. -, -, 135 S.Ct. 1656, 1673, 191 L.Ed.2d 570, 591-92 (2015) (plurality opinion) (judges are different); Miller v. Alabama, 567 U.S. -, -, 132 S.Ct. 2455, 2464, 183 L.Ed.2d 407, 418 (2012) (children are different). This is one such instance. I would conclude surveillance materials are discoverable “upon request,” even if requested before the claimant’s deposition.[11] Iowa Code § 85.27(2).
The commissioner’s interpretation of section 85.27(2) is consistent with several other states’ rules and decisions addressing surveillance materials specifically in the workers’ compensation context. See, e.g., Camelback Contractors, Inc. v. Indus. Comm’n, 125 Ariz. 205, 608 P.2d 782, 785 (Ct.App.1980) (“[T]he hearing officer correctly determined that the surveillance tapes ... were discoverable upon timely and properly served interrogatories.”); McNease v. Murphy Constr. Co., 682 So.2d 1250, 1250-51 (La.1996);[12] Johnson v. Archdiocese of New Orleans, 649 So.2d 12, 13-14 (La.Ct.App.1994); Sires v. Nat’l Serv. Corp., 560 So.2d 448, 449 (La.Ct.App.1990); State ex rel. McConaha v. Allen, *90 979 S.W.2d 188, 189-90 (Mo.1998) (concluding surveillance video tapes are “statements” under Missouri’s workers’ compensation scheme and rules of civil procedure, and thus, claimants are always entitled to view them); Minn. R. 1420.2200(8)(A)-(B) (Westlaw current through May 13, 2015) (requiring disclosure of surveillance materials at the same time a party discloses the existence of surveillance, which must occur “upon discovery demand but no later than 30 days prior to the hearing date”); 34 Pa.Code § 131.61(a) (Westlaw current through Pa. Bulletin, Vol. 45, No. 22, dated May 30, 2015) (requiring parties to exchange all information, including “tapes, films and photographs,” as part of their initial disclosures, without waiting for a discovery request).
Some other states utilize different procedures. See, e.g., Ex parte Doster Constr. Co., 772 So.2d 447, 451 (Ala.2000); Congleton v. Shellfish Culture, Inc., 807 So.2d 492, 495-96 (Miss.Ct.App.2002); De Marco v. Millbrook Equestrian Ctr., 287 A.D.2d 916, 732 N.Y.S.2d 121, 122 (2001). However, none of these states’ workers’ compensation schemes features any statute or rule resembling section 85.27(2). Accordingly, I would hold the commissioner’s declaratory order correctly concluded the statute mandates predeposition disclosure upon request of surveillance materials. Iowa Code § 85.27(2).
IV. Fact of Surveillance.
One final question remains: whether the fact that surveillance exists — along with other factual details such as dates of surveillance and the form it takes — is itself protected from disclosure. The majority declines to answer this question. I conclude the fact of surveillance is not protected from disclosure, and neither are related factual details.
The caselaw reveals two competing views on this issue in the personal injury context. A decision of the Wisconsin Court of Appeals succinctly describes the position the Institute espouses here:
A lawyer’s strategic decision to invest a client’s resources on photographic or video surveillance is protected work-product. The decision not only reflects the lawyer’s evaluation of the strengths or weaknesses of the opponent’s case but the lawyer’s instructions to the person or persons conducting the surveillance also reveals the lawyer’s analysis of potentially fruitful areas of investigation. ... Disclosure of the fact of surveillance and a description of the materials recorded would thus impinge on the very core of the work-product doctrine.
Ranft v. Lyons, 163 Wis.2d 282, 471 N.W.2d 254, 261-62 (Ct.App.1991). However, this appears to be a minority rule. Even in those cases allowing defendants to withhold surveillance materials until deposing the plaintiff, courts generally hold factual information regarding the surveillance receives no protection. See, e.g., Fletcher v. Union Pac. R.R., 194 F.R.D. 666, 668 (S.D.Cal.2000) (“[Wjhether Defendant conducted surveillance and the dates on which any surveillance took place [a]re not privileged.”); Smith, 168 F.R.D. at 587 (requiring defendants to disclose whether they performed surveillance, when they did so, and the format • of surveillance used); Dosier Constr. Co., 772 So.2d at 451; Dodson, 390 So.2d at 707 (“[A] party must disclose the existence of material which is or may be relevant to the issues in the cause, whether as substantive, corroborative, or impeachment evidence. Relevant evidence cannot be allowed to remain hidden.... ”).
I would adopt the latter view, and I find particularly persuasive the federal court’s reasoning in Smith:
*91 It may well be that the decision about if, when, or how surveillance of a plaintiff should be conducted does reveal something about how the defendant’s attorney investigates and prepares a case for trial. However, not every action that reveals, to some minimal degree, an attorney’s general strategy or approach to a case amounts to protected opinion work product. For example, the manner in which an attorney phrases his answers to interrogatories may reveal, to some degree, the attorney’s strategy in defending against the plaintiffs claims. Nonetheless, the attorney could not refuse to answer the interrogatories on the grounds of the work product doctrine.
Smith, 168 F.R.D. at 587. Because the workers’ compensation system is nonad-versarial, in this context we should uphold even more doggedly the maxim that litigation by surprise is incompatible with modern-day law practice. See Whitley v. C.R. Pharmacy Serv., Inc., 816 N.W.2d 378, 386 (Iowa 2012) (noting trial by surprise interferes with the search for truth); State ex rel. Hager v. Carriers Ins. Co., 440 N.W.2d 386, 389 (Iowa 1989) (advancing “the basic notion of fairness ... aimed at elimination of trials by ambush” (internal quotation marks omitted)); cf. Simons v. State Comp. Mut. Ins. Fund, 262 Mont. 438, 865 P.2d 1118, 1121-22 (1993) (excluding surveillance footage from trial when the employer did not disclose it as an anticipated trial exhibit). Requiring employers and insurers to disclose upon request the fact of surveillance, the dates of surveillance, the form of surveillance, and the investigator’s identity serves this purpose.
V. Conclusion.
Although I agree the commissioner did not err or abuse his discretion in ruling on Core Group’s petition for declaratory order, I disagree with the majority’s conclusion that the commissioner erred in interpreting Iowa Code section 85.27(2). I believe the commissioner correctly interpreted section 85.27(2) as requiring parties in workers’ compensation proceedings to release to a claimant — upon request— surveillance materials and factual information about such surveillance conducted in connection with the claimant’s case. As both the district court and the court of appeals reached the same conclusion as the commissioner, I would affirm their decisions.

. With respect to the analogous federal rule, the authors of a preeminent federal practice manual suggest the difference between "privilege” and "immunity” is purely a matter of nonsubstantive semantics. 8 Charles Alan Wright et al., Federal Practice & Procedure § 2023, at 492-94 (3d ed.2010) ("This matter of nomenclature should ... not continue to be of importance." (Emphasis added.)).

. I also find unpersuasive ihe Institute's assertion that the claimant always knows the activities in which he or she has participated during surveillance, so disclosure would merely duplicate existing knowledge. While it is true enough in theory that a person knows what they do from day to day, I doubt most claimants have a memory so encyclopedic that they can generate, weeks or months later, the substantial equivalent of surveillance materials depicting precise moments on specific days. See Olszewski v. Howell, 253 A.2d 77, 78 (Del.Super.Ct.1969) ("[E]ven assuming the plaintiff! ] can recall the events of the two days in question, the precise evidence which the defendant has, the film, is now unique and cannot be reproduced.”).

. In Squealer Feeds, we stated "a claimant is not entitled to obtain the file of his adversary ... merely upon request.” Squealer Feeds v. Pickering, 530 N.W.2d 678, 688 (Iowa 1995), abrogated on other grounds by Wells Dairy, Inc. v. Am. Indus. Refrigeration, Inc., 690 N.W.2d 38, 47-48 (Iowa 2004). However, the question at issue in Squealer Feeds required the court to interpret and apply the civil procedure rule establishing work product protection — not answer the question presented here under section 85.27(2). See id. Thus, my conclusion is not incompatible or inconsistent with our holding in Squealer Feeds. See Iowa Admin. Code r. 876 — 4.35 (providing that the provisions of chapter 85 supersede rules of civil procedure when the two conflict).

. The Louisiana Supreme Court distinguished McNease in Bell v. Treasure Chest Casino, L.L.C., 950 So.2d 654, 655-56 (La. 2007). However, Bell involved security camera footage that would show the actual occurrence of an injury, not surreptitious surveillance of a claimant's postinjury activities. See id. at 656. Additionally, Bell is a personal injury case, whereas McNease is a workers' compensation case. Compare id. at 655, with McNease, 682 So.2d at 1250. As I have noted, this distinction is crucial given the informal nature of workers’ compensation proceedings. Indeed, in New York the distinction is also significant, but for a different reason: workers’ compensation cases are not subject to the general rule of discovery that all films, photographs, and videos are discoverable upon demand. Compare De Marco v. Millbrook Equestrian Ctr., 287 A.D.2d 916, 732 N.Y.S.2d 121, 122 (2001) (concluding the general discovery statute governing disclosure of surveillance is not binding on the workers’ compensation board), with Tran v. New Rochelle Hosp. Med. Ctr., 99 N.Y.2d 383, 756 N.Y.S.2d 509, 786 N.E.2d 444, 448 (2003) (''[Notwithstanding the danger of tailored testimony, [the general statute governing disclosure of surveillance] requires full disclosure with no limitation as to timing, unless and until the Legislature declares otherwise.”). I again emphasize that personal injury cases are not always valuable analytical guides when resolving issues in the workers’ compensation arena.