**IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI**

**NO. 2018-KA-00527-COA**

**ERIC HODGES A/K/A PINKY** **APPELLANT**

**v.**

**STATE OF MISSISSIPPI** **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/08/2018 |
| TRIAL JUDGE: | HON. JOHN ANDREW GREGORY |
| COURT FROM WHICH APPEALED: | BENTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | BETHANY ANN TARPLEY<br>WILLIAM D. MASSEY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL<br>BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 11/26/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLTON, P.J., GREENLEE AND TINDELL, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1. Eric Hodges was indicted on two counts of manslaughter relating to the ownership of a dangerous animal under Mississippi Code Annotated section 97-3-45 (Rev. 2014), for the deaths of Derrick Sanders (Count 1) and David Glass (Count 2). Hodges owned six pit bulls. On July 4, 2014, Sanders was found dead on Highway 7 near Sexton Road. The body was found approximately sixty yards from Hodges's home but not on Hodges's property. Both the ears and testicles were missing from the body, and the body was covered with cuts and what appeared to law enforcement at the time to be an exit wound from a bullet. At that time, Sanders's death was believed to be a homicide.

¶2. Approximately six weeks later, on September 20, 2014, Glass was found in an area just yards from where Sanders's body had been found. Glass was still alive, but one ear had been chewed off, and "large chunks of meat" were missing from his body. At that time, law enforcement video-taped a short interview with Glass about the circumstances surrounding his injuries. Glass said that dogs were "coming down Sexton Road," lunged at him, ran at him, and bit him. He said he did not know whose dogs they were, but he thought the dogs were "Pinky's" dogs. Hodges's nickname is Pinky. Glass died the next morning.

¶3. Due to the proximity and similarities between the two deaths, law enforcement drew a connection between them. After further investigation, Hodges was indicted on the two counts described above. A Benton County Circuit Court jury found Hodges guilty on both counts. The court sentenced Hodges to twenty years in the custody of the Mississippi Department of Corrections (MDOC), with five years suspended and fifteen years to serve, on each count. The court set the sentences to run concurrently, with credit for time served, and placed Hodges on five years' post-release supervision. Hodges filed a motion for a new trial, which the trial court denied, and Hodges now appeals.

¶4. On appeal Hodges asserts that (1) his convictions should be reversed and his case be remanded for a new trial because the jury was not instructed on an essential element of both of the charged crimes; (2) his convictions should be reversed because there was insufficient evidence presented on two essential elements of the charged crime or, alternatively, that the verdict was against the overwhelming weight of the evidence; and (3) his convictions must be reversed because he received ineffective assistance of counsel. We find that the jury was

not instructed on an essential element of the charged crimes—that Hodges had notice of his dogs' vicious propensity. Accordingly, we reverse Hodges's convictions and sentences and remand this case for a new trial.[1]

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶5. On July 4, 2014, Derrick Sanders was found dead. Initially, the Benton County Sheriff's Department and the Mississippi Bureau of Investigations (MBI) believed Sanders had been killed by another person or group of people. Law enforcement continued to believe this until September 20, 2014, when David Glass was discovered in almost the same location and with similar injuries as Sanders. Glass was still alive when he was found. He told law enforcement that he had been bitten by dogs that he believed belonged to Pinky. Pinky is Hodges's nickname. Glass died the next day from his injuries.

¶6. Hodges was subsequently indicted on August 29, 2016, on two counts of manslaughter under section 97-3-45 for the deaths of Sanders and Glass. Both Counts were identical with the exception of the dates and the names of the victims, and provided as follows:

> That ERIC HODGES . . . of the County and State aforesaid, on or about the 4th day of July, 2014 (Count I) [the 20th day of September, 2014 (Count II)] in [Benton County, Mississippi], and within jurisdiction of this court, did unlawfully and feloniously, own a mischievous animal to wit: vicious dogs, knowing their propensity, wilfully suffer to go at large or kept without ordinary care, and such animal, while so at large, or not confined, did kill

[1] This opinion also addresses Hodges's insufficiency-of-the-evidence argument in the light of *Newell v. State*, 175 So. 3d 1260 (Miss. 2015), a case in which the Mississippi Supreme Court explained that a challenge to the sufficiency of the evidence should be addressed on appeal, even where the appellate court determines that reversal and remand is warranted based upon an evidentiary error in the trial court. *Id.* at 1267-68 (¶5).

> Derrick Sanders (Count I) [and David Glass (Count II)], a human being who shall had taken reasonable precautions to avoid the vicious dogs, in violation of [section 97-3-45]. . . .

¶7. Hodges was tried on February 12 and 13, 2018. The State's first witness was Chief Deputy Joe Batts of the Benton County Sheriff's Department. He testified that he was dispatched on July 4, 2014 to investigate a dead body found off of Highway 7 and Sexton Road. Chief Deputy Batts testified that there was only one home in the immediate area. That home belonged to Hodges. According to Chief Deputy Batts, the body was found about fifty yards on the east side of that house, between the house and the road. Later at trial, Deputy Pete Samples, who had taken measurements from the position where Sanders's body was found from the Hodges' home, testified that Sanders's body was found sixty yards from the Hodges' front door. According to Chief Deputy Batts, Sanders's body was found about 4:50 a.m. MBI Investigator Chad Cummings testified that Sanders's body had been there "a couple of hours of when he was found."

¶8. Chief Deputy Batts testified that the body had numerous injuries, including one injury that looked like the exit wound from a gunshot. He further testified that "the ears had been chewed off" and that the body had been castrated, with one testicle found about a yard away from the body. Additionally, there were scratches and scrapes all over Sanders's body. Sanders's body was also missing both shoes and was only partially clothed. One of his shoes was found in Hodges's driveway. Chief Deputy Batts testified that it did not appear to be an accident and that they believed Sanders had been killed by someone or a group of people. He testified that he and other deputies spoke with nearby residents to see whether they had

heard or seen anything, and no one did. Chief Deputy Batts specifically testified that he talked with Hodges to see if he had heard anything, and Hodges told him, "He [(Hodges)] didn't hear anything, didn't see anything."

¶9. Chief Deputy Batts testified that he decided to call the MBI because he believed the Sheriff's Department would need the bureau's help in investigating this matter. He testified that when MBI investigators arrived, they also reviewed the scene and began talking to witnesses. Chief Deputy Batts testified that "they all saw the dogs there" that day, but at that point law enforcement did not believe the dogs were responsible.

¶10. MBI Investigator Chad Cummings also testified for the State. He testified that MBI personnel determined that Sanders had been at a house south of where his body was found, and that he left the house alone. According to Investigator Cummings, MBI personnel spoke to everyone who was with Sanders earlier that night, traced their cellphone records for six hours before and after Sanders's death to see that they were where they said they were, and ruled them out as suspects. From this investigation, MBI personnel determined that no one was with Sanders when he was killed that night. MBI officers also spoke with all nearby residents and, like the Sheriff's Department, were told that no one saw or heard anything. Like the Sheriff's Department, the MBI treated Sanders's death as a homicide.

¶11. Chief Deputy Batts testified that on September 20, 2014, another person (David Glass) was discovered just a few yards from where Sanders's body had been found. Glass was still alive. Deputy Samples, who also took measurements from the position where Glass's body was found to the Hodgeses' home, testified that Glass's body was found eighty yards from

the Hodgeses' front door. Chief Deputy Batts arrived at the scene and testified that he observed that Glass's ear was missing. He decided to videotape Glass while they waited for the ambulance, and Glass explained what had happened.

¶12. The short videotape of that interview with Glass was played for the jury. In the videotape, Glass said that "dogs" were "coming down Sexton Road" toward him. The dogs lunged, ran at him, and bit him. He said it happened at about 1:00 in the morning, he was coming back from visiting "Spot's" grave.[2] Glass said that he did not know whose dogs they were, but he thought the dogs were Pinky's dogs. Chief Deputy Batts testified that Hodges's nickname is Pinky. Glass died the next morning.

¶13. Chief Deputy Batts testified that Sheriff Arnie McMullen also arrived at the scene while he was videotaping Glass. After he finished videotaping, he and Sheriff McMullen walked over to Hodges's house to talk to him. Chief Deputy Batts testified that he saw six dogs as they approached the Hodgeses' home, and three were loose in the yard. He further testified that these dogs "seemed fairly calm." The other three dogs were chained up and "were agitated, barking, straining against their chains." He "was concerned about the dogs [and] he pulled his side arm." He and Sheriff McMullen knocked on the Hodgeses' door, Eric Hodges came out, and Sheriff McMullen told Hodges to chain up the loose dogs, which Hodges did. Chief Deputy Batts testified that he transported three of the dogs (the ones that had been loose) and that they did not give him any trouble. Later at trial, Sheriff McMullen testified that he transported the other three dogs and that Hodges had to come with him

[2] Chief Deputy Batts testified that "Spot" was Derrick Sanders's nickname.

because one of the dogs had already chewed through the plastic crate that the dog was in. Chief Deputy Batts testified that all six dogs were euthanized by court order.

¶14. Sheriff McMullen testified that after he left Glass he visited the Hodgeses' home.[3] Like Chief Deputy Batts, Sheriff McMullen also testified that the large dogs that were tied up were "aggressive barking" and that "[t]hey would run at you on the chain." He testified that on that visit, he and Hodges "just talked about the dogs and I asked or he told me that he let the dogs loose some at night and that way he could tell if someone was messing around his house or his property out there they would let him know." Sheriff McMullen further testified that he believed Hodges was referring to the three dogs that were chained up when Hodges said he sometimes let them loose at night.

¶15. Chief Deputy Batts testified that the next day, on September 21, he formally interviewed Hodges. He explained to Hodges about his *Miranda*[4] rights, and Hodges's waiver was admitted into evidence. Chief Deputy Batts testified that they asked Hodges if he saw or heard anything on the night of Glass's attack. According to Chief Deputy Batts, Hodges told them that "he hadn't seen anything. Hadn't heard anything, hadn't heard any noise from his dogs. And we asked him were the dogs loose and he said no. He did not turn his dogs loose."

¶16. MBI Investigator Cummings was also involved in the Glass investigation. He testified that when the investigators saw the similarities between the Sanders and Glass incidents,

---

[3] Sheriff McMullen testified that he did not remember who was with him (Sheriff McMullen) on his first visit with Hodges.

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

including the similar injuries and the proximity between the two incidents, they determined that the two deaths were related. He then obtained a search warrant for Hodges's home and the surrounding property. Investigator Cummings testified that the dogs were not there; he added that he had only observed the dogs after they were euthanized. He testified that there was a strong smell of Clorox on the premises, which seemed "kind of strange to us." Investigator Cummings also testified that he had previously collected samples from the dogs that had been euthanized and clothing samples from both Sanders and Glass from the respective days that they were attacked. These samples were sent to a lab that MBI personnel had located at the University of California-Davis at Sacramento, which has the capabilities for testing for canine DNA.

¶17. Elizabeth Wictum was admitted as an expert in the field of animal DNA, and her report on the clothing and dog samples received from the MBI was admitted into evidence. She testified that she was able to attribute one of the dog hairs found on Sanders's body to one of Hodges's dogs and that she found mitochondrial DNA consistent with two of Hodges's dogs. Dr. Wictum also testified that none of the samples submitted with respect to Glass implicated Hodges's dogs.

¶18. Sharon Reader, Glass's sister and Hodges's neighbor, also testified for the State. Reader testified that about two and one-half weeks before Glass's death, she spoke to Hodges's wife, Mary Ann, about concerns she had regarding the dogs. Reader testified that she told Mary Ann to tell Hodges about her concerns. Reader testified that Hodges's dogs would come up the road to her driveway and that she had concerns about them with her

grandchildren around. She asked Mary Ann to ask Hodges to keep the dogs tied up because she was afraid they were going to attack her grandchildren. As Reader described it in cross-examination, "I'm telling you when I was coming out of my house to go across the yard they were charging from down by the mailbox coming up the hill and I ran back in the house and that is when I called her [Hodges's wife]." Reader testified that she had not "personally observed these dogs being aggressive to any other neighbor, friend, or family member."

¶19. The State rested. The defense moved for a directed verdict, which the trial court denied.

¶20. Hodges did not testify on his own behalf, but the defense put on seven witnesses who testified that the dogs were not aggressive. Mark Feathers testified that he lived about a half a mile from the Hodgeses and had visited with them several times over the years, always with the dogs present. Feathers testified that he would "just walk up on the porch, knock on the door, and the dogs would just sit there." He testified, "They were never aggressive to me in any way."

¶21. Glen Sexton also testified that he had never had a problem with Hodges's dogs. Sexton testified that he went to the Hodgeses' home three or four times a year, occasionally when Hodges was not home. Like Feathers, Sexton testified that the dogs were never aggressive with him. In fact, the dogs would come out "wagging" when he would pull up. According to Sexton, the dogs might bark when someone first pulled up, but that was it.

¶22. The defense also called Robert Childress, a dry-cleaning delivery man. Childress testified that he had been coming to the Hodgeses' home once every three months for twenty

years. Childress had been to the home both with and without the Hodgeses present. When the Hodgeses were not there, Mary Ann would hang her dry cleaning on the storm door in the front of the house. To pick it up, Childress would get out of his truck, walk to the front of the home, knock on the door, get the dry cleaning, and leave. According to Childress, the dogs "didn't really pay [him] no attention. They just lay there." The dogs never tried to hurt Childress while they were loose and he was on the Hodgeses' property. On cross-examination, the State established that Childress did not have occasion to go into the Hodgeses' back yard on any of his deliveries.

¶23. Sherlay Crayton testified that she visited the Hodgeses' home in February or March 2014, a few months before Sanders's death, and that she got out of her car, climbed on the porch, knocked on the door, and noticed a dog lying on the porch. The dog never bothered her. Shirley Gilmore also testified about visiting the Hodgeses' home in 2014. She said there was nothing unusual about the dogs' behavior, they were "[j]ust dogs. I mean normal dogs." Another witness, Orlando Williams, also testified that there was nothing strange about the dogs' behavior, the dogs did not bark at him, and they did not run up to him or try to bite him.

¶24. Mark Tucker, who found Sanders's body, was also Hodges's neighbor and had been to the Hodgeses' home. Tucker testified that he too had never had a problem with the dogs. According to Tucker, the dogs acted like normal dogs, running and playing. Tucker would see the dogs in the front yard and testified that "[t]hey love[d] to play."

¶25. The defense rested. Trial counsel did not renew the motion for a directed verdict at

the end of trial or request a peremptory instruction at the close of all the evidence.

¶26. The trial court dismissed the jury for the day and then held the jury-instruction conference. The next morning, the trial court read the jury instructions to the jury. To avoid repetition, we will address the jury-instruction conference and the content of the jury instructions below when addressing Hodges's assignment of error on this issue.

¶27. The jury found Hodges guilty of the charges in both Count I and Count II. Hodges filed a "Motion for a New Trial" on March 5, 2018, and in that motion Hodges also asserted that "the [trial court] erred in overruling Defendant's oral motion for a directed verdict in favor of the defendant at the close of the State's case-in-chief." On March 8, 2018, the trial court held Hodges's sentencing hearing and entered its sentencing order on March 19, 2018. Hodges was sentenced to twenty years in MDOC's custody, with five years suspended and fifteen years to serve, on each count, with the sentences to run concurrently. Hodges was given credit for time served, and the trial court also ordered that Hodges be placed on five years' post-release supervision. Additionally, Hodges was ordered to pay court costs and restitution. The trial court denied Hodges's post-trial motion, and Hodges appealed.

## DISCUSSION

¶28. Hodges asserts that his fundamental rights were violated when the trial court failed to instruct the jury on an essential element of the manslaughter charges against him. In particular, he asserts that the trial court did not instruct the jury that they must find that Hodges knew that his dogs had a propensity for "mischievousness" or dangerousness, as required under section 97-3-45. For the reasons addressed below, we reverse Hodges's

convictions and sentences based upon this assignment of error and remand this case for a new trial.

¶29. Hodges was charged with two counts of dangerous-animal manslaughter under section 97-3-45, which provides as follows:

> If the owner of a mischievous animal, knowing its propensity, wilfully suffer it to go at large, or shall keep it without ordinary care, and such animal, while so at large, or not confined, kill any human being who shall have taken reasonable precautions to avoid the animal, such owner shall be guilty of manslaughter.

As such, the elements of manslaughter relating to the ownership of a dangerous animal are that the defendant (1) owns a "mischievous" animal; (2) and, knowing its propensity for mischievousness (i.e., to be dangerous);[5] (3) willfully allows it to go at large or keeps it without ordinary care; and (4) while so at large or not confined, the animal kills any human being; (5) who took reasonable precautions to avoid the animal. *See id.*

¶30. In this case, Hodges's trial counsel did not object to the State's proposed jury instructions on the elements for manslaughter under section 97-3-45 (jury instructions S-1

---

[5] Mississippi courts have not had the opportunity to interpret section 97-3-45. However, the Mississippi Model Jury Instructions Commission equates the word "mischievous" with the word "dangerous" in its 2012 proposal for the use of plain-language instructions. Miss. Model Jury Instructions Comm'n, Proposed Mississippi Plain Language Model Jury Instructions - Criminal, No. 2726, at 213-14 (2012). Although not binding, we find the Commission's synonymous use of these words persuasive. *See Grassier v. State*, 266 So. 3d 1038, 1041-42 (¶¶13-16), 1041 n.1 (Miss. Ct. App. 2018), *cert. denied*, 267 So. 3d 280 (Miss. 2019); 3B C.J.S. *Animals* § 365, at 475-76 (2013) ("'Mischievous,' within the common-law rule of liability for injuries inflicted by a mischievous animal, does not connote a mere playful canine trickster but connotes conduct producing or tending to produce mischief or harm or that is injurious, deleterious, or hurtful."). Further, Hodges was indicted for "own[ing] . . . mischievous animal[s,] to wit: *vicious* dogs . . . ." (Emphasis added).

and S-2), which constituted the two counts against Hodges. Rather, he withdrew his proposed instructions on the elements for manslaughter under section 97-3-45, stating, "I think mine pretty much say[] the same thing as S-1 and S-2." Accordingly, the trial court found that the State's proposed jury instructions S-1 and S-2 would be given by agreement. *Id.*

¶31. Jury instruction S-1 provided as follows:

> The Defendant, ERIC HODGES, has been charged in Count One of the Indictment with the offense of Manslaughter.
>
> If you find from the evidence in this case beyond a reasonable doubt that:
>
> 1. ERIC HODGES, on or about the 4th day of July, 2014, in Benton County, Mississippi,
> 2. owned a mischievous animal(s), to wit: vicious dogs,
> 3. knowing their propensity to go at large, or were kept without ordinary care,
> 4. and such animal(s), while so at large or not confined,
> 5. did kill Derrick Sanders, a human being,
> 6. who took reasonable caution to avoid the vicious dogs,
>
> then you shall find the Defendant guilty as charged under Count 1 of the Indictment.[6]

---

[6] We observe that defense trial counsel misspoke when he said that the State's proposed jury instructions S-1 and S-2 were "pretty much the same" as the defense's proposed jury instructions. In contrast to the State's instructions, the defense's proposed jury instruction D-1 stated in relevant part the following as to Count I:

> If you should find from the evidence presented in the case that the State has failed to prove any one or more of the following elements of the crime in this case beyond a reasonable doubt, you shall find the defendant, Eric Hodges,

Jury instruction S-2, which the State presented for Count 2, was identical, except it substituted David Glass's name and date of attack for the relevant sections. Based on these instructions, the jury found Hodges guilty on both counts.

¶32. Hodges asserts that an essential element was omitted from each instruction, namely that he owned his dogs "knowing [their] propensity [for mischievousness/dangerousness]," as provided in section 97-3-45. Instead, this element was substituted with the lessor requirement that Hodges only "know[] [the dogs'] propensity to go at large."

¶33. Proposed model jury instructions support Hodges's assertion that the jury was not properly instructed in this essential element of the charge. Proposed Mississippi Plain

---

not guilty of Count One of the Indictment:

1. That Eric Hodges owned or kept the dogs accused of killing the victim, Derrick Sanders, on or about July 4, 2014;

2. That the accused dogs did in fact attack and cause the death of Derrick Sanders on or about July 4, 2014;

3. *That the accused dogs had in fact shown a propensity for violence toward human beings before the alleged killing of Derrick Sanders on or about July 4, 2014*;

4. *That the defendant, Eric Hodges, was in fact aware of the dogs' propensity for violence toward human beings before the alleged killing of Derrick Sanders on or about July 4, 2014*;

5. That Eric Hodges, the defendant, failed to take ordinary care with the dogs at the time of the alleged attack on Derrick Sanders; and

6. That David Glass failed to take reasonable precautions to avoid the dogs at the time of the alleged attack on or about July 4, 2014.

(Emphasis added). The defense's proposed jury instruction D-2 was identical to D-1, with the exception of the name of the victim (David Glass) and date of attack.

Language Model Jury Instruction 2726 states:

> If you find beyond a reasonable doubt from the evidence in this case that:
>
> 1. On or about [date of the alleged crime], in ______ County;
>
> 2. [Name of defendant] owned [a/an] ______ [specify animal], a [dangerous/mischievous animal, *knowing that it was a* [*dangerous/mischievous animal*]; and
>
> 3. [Name of defendant] [intentionally willfully]:
>
> > A. Allowed the [dangerous/mischievous] animal to roam free; or
> >
> > B. Did not take reasonable steps to confine the animal; and
>
> 4. While the animal was ___________ [specify (1) roaming free or (2) not confined], the animal killed ______ [name of victim], a human being, who acted reasonably to avoid the animal,
>
> then you shall find ______ [name of defendant] guilty as charged.

Miss. Model Jury Instructions Comm'n, Proposed Mississippi Plain Language Model Jury Instructions - Criminal, No. 2726, at 213-14 (2012) (instructive brackets in original) (emphasis added).

¶34. Similarly, the suggestive Mississippi Practice Model Jury Instructions provide:

> ________ [Defendant's name] has been charged in _ [count no.] with the offence of manslaughter. If you find from the evidence in this case beyond a reasonable doubt that:
>
> 1. On or about __ [date of the offense] in __ [county of offense];
>
> 2. That __ [victim's name] was a human being; and
>
> 3. That [defendant's name] was the owner of a mischievous animal and *knew of the mischievous animal's propensity*; and
>
> 4. ________ [Defendant's name] [did unlawfully and willfully suffer it to go

> at large/unlawfully kept it without ordinary care] and while such animal was at large and not confined, did kill __ [victim's name], who took reasonable precautions to avoid the animal;
>
> then you shall find the defendant guilty.

Mississippi Model Jury Instructions (Criminal) § 8:19 (Miss. Judicial Coll. 2d ed. 2019) (emphasis added).

¶35. As Hodges acknowledges, he did not object to proposed jury instruction S-1 or S-2. "To preserve a jury instruction issue on appeal, the defendant must make a specific objection to the proposed instruction to allow the [circuit] court to consider the issue." *Caffie v. State*, 269 So. 3d 1203, 1205 (¶11) (Miss. Ct. App. 2018). The State asserts the jury was adequately instructed, but even if it was not, the issue is procedurally barred. *Id.*

¶36. Nevertheless, we will consider this issue for plain error. "[T]he Mississippi Supreme Court has stated that instructing the jury on every element of the charged crime is so basic to our system of justice that it should be enforced by reversal in every case where inadequate instructions are given, regardless of a failure to object at trial." *Chesney v. State*, 165 So. 3d 498, 503 (¶10) (Miss. Ct. App. 2015) (citation and internal quotation mark omitted); *Pollard v. State*, 932 So. 2d 82, 87 (¶11) (Miss. Ct. App. 2006) ("[T]he trial court committed plain error by adopting an instruction that did not fully instruct the jury on the elements of the crime; thus, the procedural bar [based upon counsel's failure to object] does not apply."). "[T]he failure to instruct the jury on the essential elements of the crime is plain error." *Bolton v. State*, 113 So. 3d 542, 544 (¶4) (Miss. 2013); *see also Chesney*, 165 So. 3d at 503 (¶10). As the supreme court has also observed, "because the State has to prove each element

of the crime beyond a reasonable doubt, then the State also has to ensure that the jury is properly instructed with regard to the elements of the crime." *Hunter v. State*, 684 So. 2d 625, 635 (Miss. 1996).

¶37. The State asserts that the relevant instructions, as read to the jurors, included the phrase "knowing their [the dogs'] propensity," as follows:

> If you find from the evidence in this case beyond a reasonable doubt that Eric Hodges on or about the 4th day of July, 2014 in Benton County, Mississippi owned a mischievous dog to wit; vicious dogs, knowing their propensity to go at large or kept without ordinary care and such animal while so at large or not confine, did kill Derrick Sanders, a human being, which took reasonable caution to avoid the vicious dogs. Then you shall find the defendant guilty under count one of the indictment. . . .

According to the State, "[w]hile the aural reading by necessity lacks punctuation, it is very nearly verbatim to the statutory language of [section] 97-3-45." From this reasoning, the State asserts that reading the jury instructions "as a whole" demonstrates that the jury was adequately instructed on each of the essential elements of the crimes, including the requirement that Hodges knew that his dogs had a propensity for violence. *See Caffie*, 269 So. 3d at 1205 (¶11) ("The jury instructions are to be read as a whole, with no one instruction to be read alone or taken out of context. When read together, if the jury instructions state the law of the case and create no injustice, then no reversible error will be found.") (citation and internal quotation marks omitted).

¶38. In contrast, Hodges asserts that there were only two substantive jury instructions in this case, S-1 and S-2. These instructions were identical, except for the names of the deceased and the applicable dates. Neither instruction, whether in written form or as read

to the jury, articulated the essential requirement that the jury find that Hodges knew of his dogs' dangerous propensity.

¶39. Further, the written instructions, which the jury took with them during deliberations, had numbered paragraphs for each proposed element of the crime. The only "knowledge" element in the substantive instructions was that the jury find that Hodges "2) owned a mischievous animal(s), to wit; vicious dogs, 3) knowing their propensity to go at large, . . . ." (Emphasis added).

¶40. We find that the omission of any element regarding Hodges's knowledge of his dogs' propensity for mischievousness is particularly relevant in the light of the trial court's general instructions to the jury. In jury instruction C-1, the jurors were specifically instructed to review the written instructions before they began deliberations, as follows:

> You will enter into the jury room for deliberations and the court suggests that you discuss the facts of the case, *review the written instructions before you begin voting or attempting to decide the case*. The burden of proving the defendant guilty *of every material element of the crime for which he is charged* is upon the State of Mississippi.

(Emphasis added). Thus, contrary to the State's argument that the jury instructions, read as a whole, stated the law of the case, we find that the instructions, as a whole, omit the essential element that the jury find that Hodges knew that his dogs had a dangerous propensity.

¶41. As we recognized above, both this Court and the supreme court have consistently held that the "failure to instruct the jury on the essential elements of the crime is plain error." *Bolton*, 113 So. 3d at 544 (¶4) (finding plain error where jury instruction on burglary omitted

essential element of the crime); *Shaffer v. State*, 740 So. 2d 273, 282 (¶31) (Miss. 1998) (holding that the court's failure to instruct the jury on an essential element of the crime charged, denied the defendant his fundamental right to due process"); *Chesney*, 165 So. 3d at 503 (¶22) (finding plain error where the jury instruction failed to properly instruct the jury on an essential element of venue).[7]

¶42. Nor will we engage in a harmless error analysis. In *Harrell v. State*, 134 So. 3d 266, 271 (¶18) (Miss. 2014), the supreme court expressly rejected the idea that "appellate courts [may] engage in harmless error analysis when the trial courts fail to instruct juries as to the elements of the crime charged." Instead, the supreme court held in *Harrell* "that it is always and in every case reversible error for the courts of Mississippi to deny an accused the right to have a jury decide guilt as to each and every element." *Id.* at 275 (¶30). We therefore reverse and remand for a new trial on this issue. *Bolton*, 113 So. 3d at 544 (¶4).

¶43. The other issues on appeal are (1) whether Hodges's convictions should be reversed because there was insufficient evidence presented on two essential elements of the charged crime, or, alternatively, whether the verdict was against the overwhelming weight of the evidence; and (2) whether Hodges's received ineffective assistance of counsel. Although we

---

[7] In *Esters v. State*, No. 2017-KA-01300-COA, 2019 WL 125897, at *5 (¶20) (Miss. Ct. App. Jan. 8, 2019), *cert. denied*, 276 So. 3d 659 (Miss. 2019), cited by the State, we found no plain error reversal was warranted where "[a]lthough perhaps technically imperfect, . . . instruction S-1A nevertheless covered the substance of the essential elements of auto burglary and properly instructed the jury on the crime charged." That is not the situation in this case. As we discuss above, the jury was not instructed on an essential element of section 97-3-45, and thus plain-error reversal is warranted. Indeed, we recognize this principle in *Esters*, as follows: "We must reverse . . . where the trial court fails to instruct the jury on the essential elements of the crime." *Id.* at *4 (¶17).

have found that it was plain error when the trial court failed to instruct the jury on an essential element of the manslaughter charges against Hodges, we will briefly address Hodges's assertion regarding the sufficiency of the evidence because a finding for Hodges on this claim would result in a reversal and rendering of the judgment in his favor. *See Newell*, 175 So. 3d at 1267 (¶5); *Husband v. State*, 204 So. 3d 353, 360 (¶19) (Miss. Ct. App. 2016).

¶44. We find that had the jury been properly instructed, the State offered sufficient evidence to support the manslaughter verdicts against Hodges with respect to the deaths of Sanders and Glass. "In reviewing the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith v. State*, 275 So. 3d 100, 109 (¶28) (Miss. Ct. App. 2019). In this regard, this Court "may only reverse a denial of a JNOV motion when, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." *Id.*

¶45. As set forth above, the elements of manslaughter under section 97-3-45 are that the defendant owns a dangerous animal and, knowing its dangerous propensity, willfully allows it to go at large or keeps it without ordinary care, and the animal kills someone while so at large or not confined. Additionally, it must be shown that the victim did not take reasonable precautions to avoid the animal. Miss. Code Ann. § 97-3-45. Hodges's first assertion is that the State failed to prove that he had knowledge of his dogs' dangerous propensity before

Sanders's and Glass's deaths. *Id.* We disagree. The jury heard the testimony of Chief Deputy Batts that three of Hodges's dogs were chained up in Hodges's yard and "were agitated, barking, [and] straining against their chains." Chief Deputy Batts testified that he "was concerned about the dogs [and] he pulled his side arm." Similarly, Sheriff McMullen testified that when he went to the Hodgeses' home, the large dogs that were chained up in the yard were "aggressive[ly] barking" and that "[t]hey would run at [him] on the chain" as he approached Hodges' home. Sheriff McMullen also testified that Hodges had to come with him when he transported these three dogs because one of the dogs had already chewed through the plastic crate that it was in. Further, Sheriff McMullen testified that Hodges told him "that he let the dogs loose some at night and that way he could tell if someone was messing around his house or his property out there they would let him know." We find that the jury could reasonably infer from this testimony that Hodges' dogs were at large and that Hodges was aware of the aggressive, dangerous propensity of his dogs.

¶46. Further, with respect to Hodges's knowledge prior to Glass's death, in particular, the jury also heard Sharon Reader's testimony that when she was coming out of her house, Hodges's dogs came "charging from down by the mailbox coming up the hill and [she] ran back in the house." It was after this happened that Reader called Hodges's wife, Mary Ann, because Reader feared for her grandchildren's safety. Reader testified that she asked Mary Ann to ask Hodges to keep his dogs tied up because she was afraid they were going to attack her grandchildren. This phone conversation took place just two and a half weeks before Glass was killed. We find that a jury could reasonably infer that Mary Ann had conveyed

this information to her husband regarding the very dogs kept in their own household.

¶47. Hodges also asserts that as to Sanders's death, only, the State did not present sufficient evidence that Sanders took "reasonable precautions to avoid the [dogs]." *Id.* We also find no merit in this assertion. The bodies of both victims were found on public property, near a public road. A jury could reasonably conclude that Sanders would stay on public property road to avoid dogs protecting private property. Hodges asserts, however, that there was also undisputed testimony that Sanders's shoe was found in Hodges's driveway. We find, however, that the jury was entitled to weigh this evidence against the fact that Sanders's mutilated body was found on public grounds, that Sanders, himself, had not been in Hodges' driveway, and that he took reasonable means to protect himself and avoid the dogs by walking in public areas.

¶48. These issues are all questions for the jury, and, upon being properly instructed, we find that viewing the evidence in the light most favorable to the prosecution, reasonable jurors could have found beyond a reasonable doubt that Hodges was guilty of manslaughter for the deaths of Sanders and Glass. *Gillett v. State*, 56 So. 3d 469, 505 (¶102) (Miss. 2010) ("The jury determines the weight and credibility to give witness testimony and other evidence. This Court may not pass upon the credibility of witnesses and, where the evidence justifies a verdict, it must be accepted as having been found worthy of belief.") (citation and internal quotation mark omitted). For the same reasons, we would find that had the jury been properly instructed, the trial court would not have abused its discretion in denying Hodges's motion for a new trial because the jury's verdict was not "so contrary to the overwhelming

weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Smith*, 275 So. 3d at 110 (¶35).

¶49. We do not address Hodges's ineffective-assistance-of-counsel claim because "our supreme [court] has held that if a case is reversed on other grounds, a claim of ineffective assistance is moot." *Husband*, 204 So. 3d at 360 (¶19) (citing *Read v. State*, 430 So. 2d 832, 841 (Miss. 1983)) (other citation omitted).

¶50. **REVERSED AND REMANDED.**

**BARNES, C.J., J. WILSON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**